## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

AMERICAN SECURITIES
ASSOCIATION,

               Plaintiff,

    v.

U.S. DEPARTMENT OF LABOR;
MARTY WALSH, in his official
capacity as the Secretary of Labor,

               Defendants.

Civil Action No. 8:22-cv-330

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
## MEMORANDUM OF LAW IN SUPPORT

J. Michael Connolly (*pro hac vice*)
Steven C. Begakis (*pro hac vice*)
Daniel Shapiro (FL Bar #1011108)
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com
daniel@consovoymccarthy.com

*Counsel for Plaintiff American Securities
Association*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................................. 1

STATEMENT OF MATERIAL FACTS ........................................................ 3

LEGAL BACKGROUND ...................................................................... 5

   I.   The Regulation of Fiduciaries Under ERISA and the Internal Revenue Code ..................................................................................... 5

   II.   The 2016 Fiduciary Rule and the Fifth Circuit's Decision Vacating the Rule .................................................................................... 7

   III.   The Department's 2020 Prohibited Transaction Exemption and Interpretation and the 2021 "Frequently Asked Questions" ..................... 10

STANDARD OF REVIEW ................................................................... 15

ARGUMENT ................................................................................... 16

   I.   The Department's pronouncements in FAQ 7 violate the APA. ............... 16

       A.   The Department's pronouncements in FAQ 7 improperly amend the Department's rules without notice and comment. ....................... 16

       B.   The Department's pronouncements in FAQ 7 are arbitrary and capricious. ..................................................................... 19

   II.   The Department's pronouncements in FAQ 15 violate the APA. ............. 24

       A.   The Department's pronouncements in FAQ 15 improperly amend the Department's rules without notice and comment. .......... 24

       B.   The Department's pronouncements in FAQ 15 are arbitrary and capricious. ..................................................................... 26

   III.   The Court should declare that the pronouncements in FAQ 7 and FAQ 15 are unlawful, enjoin the Department from enforcing them, and vacate and set them aside. ...................................................... 28

CONCLUSION ............................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ................................................................. 15

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,*
  781 F.3d 1271 (11th Cir. 2015) ................................................................. 28

*Bonnichsen v. United States,*
  367 F.3d 864 (9th Cir. 2004) .................................................................... 22

*Cath. Health Initiatives v. Sebelius,*
  617 F.3d 490 (D.C. Cir. 2010) .................................................................. 27

*Chamber of Commerce v. U.S. Dep't of Labor,*
  885 F.3d 360 (5th Cir. 2018) ...........................................................*passim*

*Children's Hosp. of the King's Daughters, Inc. v. Azar,*
  896 F.3d 615 (4th Cir. 2018) ................................................................... 28

*Christensen v. Harris Cnty.,*
  529 U.S. 576 (2000) ................................................................................. 24

*EPIC v. DHS,*
  653 F.3d 1 (D.C. Cir. 2011) ............................................................... 25, 26

*Gorss Motels, Inc. v. Safemark Sys., LP,*
  931 F.3d 1094 (11th Cir. 2019) ................................................................ 27

*Health Freedom Def. Fund, Inc. v. Biden,*
  No. 8:21-cv-1693, --- F. Supp. 3d ---, 2022
  WL 1134138 (M.D. Fla. Apr. 18, 2022) ............................................. 15, 28

*Int'l Union, United Mine Workers of Am. v. MSHA,*
  407 F.3d 1250 (D.C. Cir. 2005) ............................................................ 1, 16

*Iowa League of Cities v. EPA,*
  711 F.3d 844 (8th Cir. 2013) ................................................................... 26

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) .................................................................. 1, 20, 23

*Leslie Salt Co. v. United States,*
  55 F.3d 1388 (9th Cir. 1995) ................................................................... 19

*Mendoza v. Perez,*
  72 F. Supp. 3d 168 (D.D.C. 2014) ........................................................... 28

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) ...................................................................16, 25

*Mountain States Health All. v. Burwell,*
    128 F. Supp. 3d 195 (D.D.C. 2015).....................................................................27

*N.H. Hosp. Ass'n v. Azar,*
    887 F.3d 62 (1st Cir. 2018) ........................................................................*passim*

*Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014) .............................................................................19

*O.A. v. Trump,*
    404 F. Supp. 3d 109 (D.D.C. 2019).....................................................................15

*Perez v. Mortgage Bankers Ass'n,*
    575 U.S. 92 (2015) .............................................................................1, 16, 18

*Shaw v. Delta Air Lines, Inc.,*
    463 U.S. 85 (1983) ................................................................................................5

*United Farm Workers of Am., AFL-CIO v. Chao,*
    227 F. Supp. 2d 102 (D.D.C. 2002)......................................................................23

*United States v. Morton Salt Co.,*
    338 U.S. 632 (1950) ..............................................................................................1

*United States v. Wilson,*
    503 U.S. 329 (1992) ............................................................................................22

*Util. Air Reg. Grp. v. EPA,*
    573 U.S. 302 (2014) ............................................................................................23

*Weyerhaeuser Co. v. Costle,*
    590 F.2d 1011 (D.C. Cir. 1978) ............................................................................1

*Yates v. Collier,*
    868 F.3d 354 (5th Cir. 2017)...............................................................................27

*York v. Wellmark, Inc.,*
    No. 16-cv-627, 2017 WL 11261026 (S.D. Iowa) .............................................18, 24

**STATUTES**

26 U.S.C. §4975...................................................................................................6, 7

29 U.S.C. §1002 ...............................................................................................6, 20

29 U.S.C. §1104 ....................................................................................................6

29 U.S.C. §1106 ....................................................................................................6

iv

29 U.S.C. §1108 ................................................................................. 5, 6, 7, 24

29 U.S.C. §1135 ...................................................................................... 5, 7

5 U.S.C. §553 ............................................................................................ 16

5 U.S.C. §706 ............................................................................... 15, 19, 28

## OTHER AUTHORITIES

29 C.F.R. §2510.3-21 ........................................................................... *passim*

*Conflict of Interest Rule — Retirement Investment Advice: Notice of Court
   Vacatur*, 85 Fed. Reg. 40589 (July 7, 2020) ............................................ 10

*Definition of the Term "Fiduciary"; Conflict of Interest Rule — Retirement
   Investment Advice*, 81 Fed. Reg. 20946 (Apr. 8, 2016) ............................ 8, 9, 17, 21

FAB No. 2021-02 (Oct. 25, 2021) ......................................................... 14

Fed. R. Civ. P. 56 ..................................................................................... 15

Merriam-Webster Dictionary, bit.ly/3wxHAw0 ..................................... 22

*New Fiduciary Advice Exemption: PTE 2020-02 Improving Investment
   Advice for Workers & Retirees Frequently Asked Questions*,
   U.S. Dep't of Labor (Apr. 2021) ....................................................... 4, 12

*Notification of Proposed Class Exemption*,
   85 Fed. Reg. 40834-01 (July 7, 2020) ................................................. 10

*Prohibited Transaction Exemption 2020-02, Improving Investment Advice
   for Workers & Retirees*, 85 Fed. Reg. 82798 (Dec. 18, 2020) .......... *passim*

R. Pence & D. Emery, *A Grammar of Present Day English* (2d ed. 1963) ......... 22

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...... 27, 28

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

Congress passed the Administrative Procedure Act to ensure that agencies follow constraints as they exercise their powers. "[F]ramed against a background of rapid expansion of the administrative process," the APA serves as "a check upon administrators whose zeal might otherwise . . . carr[y] them to excesses not contemplated in legislation creating their offices." *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950).

The APA's requirement that agencies engage in notice-and-comment rulemaking is one of the law's most important checks on agency power. This process ensures that "agency regulations are tested via exposure to diverse public comment" and that there is "fairness to affected parties." *Int'l Union, United Mine Workers of Am. v. MSHA*, 407 F.3d 1250, 1260 (D.C. Cir. 2005). By mandating "openness, explanation, and participatory democracy," these procedures seek to avoid "the dangers of arbitrariness and irrationality in the formulation of rules." *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1028 (D.C. Cir. 1978).

The APA also requires agencies to comply with their own regulations. If an agency wants to amend its rules, it must "use the same procedures" that it "used to issue the rule in the first instance." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015). And while agencies can interpret their own rules, they cannot issue interpretations that are unreasonable or inconsistent with the plain meaning of the rules. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).

1

The U.S. Department of Labor has failed to comply with its obligations under the APA. In April 2021, the Department released a series of "Frequently Asked Questions" that purported to provide "guidance" for individuals seeking to comply with the Department's rules governing investment advice. In reality, however, the Department used these FAQs to improperly amend its rules outside of the APA's notice-and-comment process.

Two FAQs are relevant here. In FAQ 7, the Department stated that a financial professional's "first instance" of advice to rollover assets from one retirement plan to another can be the act of a "fiduciary," even though the Department's rules state that a person is not a fiduciary unless he provides advice on a "regular basis to the plan." And in FAQ 15, the Department imposed a host of new documentation and investigation requirements on institutions making rollover recommendations, even though the exemption the Department previously promulgated contains no such requirements.

The APA plainly prohibits this type of rulemaking. If the Department wanted to change its rules, it had one option: notify the public that it intended to amend its rules and provide an opportunity to comment. It failed to do that, choosing instead to amend its rules through a guidance document it posted on its website. Because the FAQs didn't go through the notice-and-comment process and are inconsistent with a plain reading of the Department's rules, the Court should

2

declare that the pronouncements in FAQ 7 and FAQ 15 are unlawful, enjoin the Department from enforcing them, and vacate and set them aside.

## STATEMENT OF MATERIAL FACTS

1.      In December 2020, the U.S. Department of Labor published a document containing a class exemption from certain prohibited transactions under ERISA. *See* Administrative Record ("AR") 65-69 (*Prohibited Transaction Exemption 2020-02, Improving Investment Advice for Workers & Retirees*, 85 Fed. Reg. 82798 (Dec. 18, 2020) ("the Exemption")).[1] The document also contained a new interpretation concerning when advice to roll over assets from an employee benefit plan to an individual retirement account ("IRA") will be considered "fiduciary" investment advice under Title I of ERISA and the Internal Revenue Code of 1986. AR 8-11.

2.      In April 2021, the Department issued a set of "Frequently Asked Questions" concerning, among other things, (1) when advice to roll over assets from an employee benefit plan to an IRA will be considered to be on a "regular basis" under the Department's rules (FAQ 7); and (2) what factors financial institutions and investment professional must consider and document when disclosing the "specific reasons" that a rollover recommendation is in a retirement

---

[1] Per the Court's scheduling order, the parties will file a joint appendix on August 26 that contains the portions of the administration record cited in the parties' briefs.

investor's best interest (FAQ 15). *See* AR 1346-61 (*New Fiduciary Advice Exemption: PTE 2020-02 Improving Investment Advice for Workers & Retirees Frequently Asked Questions*, U.S. Dep't of Labor (Apr. 2021)).

3.      The American Securities Association (ASA) is a trade association of regional financial services firms that help individuals create and preserve wealth and provide Main Street businesses and others with access to capital. ASA's mission is to promote trust and confidence among investors, facilitate capital formation, and support efficient and competitively balanced capital markets. ASA has a geographically diverse membership base that spans every region of the United States. ASA's principal place of business is in Tampa, Florida. Ex. A at 1-2, ¶3 (Iacovella Decl.).

4.      ASA has members that are injured by the Department's pronouncements in FAQ 7 and FAQ 15. In particular, ASA has at least one member that prohibits its investment advisors from recommending that investors roll over assets out of an employee benefit plan out of concern that such advice will confer ERISA fiduciary status under the Department's pronouncements in FAQ 7. Absent these pronouncements, this member would allow its investment advisors, when appropriate, to recommend that investors roll over assets out of an employee benefit plan, even if it was the advisor's first contact with the investor. Ex. A at 2, ¶¶4-5 (Iacovella Decl.); Ex. B at 3, ¶8 (Shultz Decl.).

5.     ASA also has at least one member that will utilize the December 2020 Exemption but is now expending additional time and resources to comply with the Department's requirements in FAQ 15. This member would not endure these costs and burdens but for the Department's pronouncements about the documentation required to comply with the Exemption. Ex. A at 2, ¶6 (Iacovella Decl.); Ex. C at 4-5, ¶¶10, 12 (Palermo Decl.).

6.     Finally, ASA has at least one member that will not utilize the December 2020 Exemption to avoid the costs of complying with the Department's requirements set forth in FAQ 15. Absent the Department's pronouncements in FAQ 15, this member would utilize the Exemption to engage in the activities that the Exemption explicitly permits. Ex. A at 2, ¶7 (Iacovella Decl.); Ex. B at 5, ¶¶13-14 (Shultz Decl.).

## LEGAL BACKGROUND

### I.   The Regulation of Fiduciaries Under ERISA and the Internal Revenue Code

In 1974, Congress passed ERISA as a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). Title I of ERISA gives the Department of Labor far-reaching regulatory authority over employer-sponsored retirement plans (*e.g.*, a defined benefit plan that promises participating employees a fixed, pre-established benefit at retirement). *Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 364 (5th Cir. 2018) (citing 29 U.S.C. §§1108(a)-(b),

1135). Title I designates certain service providers to retirement plans as "fiduciaries" and subjects these individuals to duties of loyalty and prudence. 29 U.S.C. §1104(a)(1)(A)-(B). Under Title I, a person is a "fiduciary with respect to a plan" to the extent he, among other things, "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." *Id.* §1002(21)(A)(ii). Title I prohibits fiduciaries from engaging in certain "prohibited transactions," such as transactions in which the fiduciary receives a commission paid by a third party or compensation that varies based on the advice that is provided. *See id.* §1106(b)(3). Title I authorizes the Department to grant exemptions allowing institutions and individuals to engage in these prohibited transactions. *See id.* §1108(a), (b).

Title II of ERISA, by contrast, created tax-deferred personal IRAs and similar accounts within the Internal Revenue Code (*e.g.*, a traditional IRA that allows individuals to contribute pre-tax income toward investments that can grow tax-deferred). 26 U.S.C. §4975(e)(1)(B). Unlike Title I of ERISA, Title II does not give the Department broad authority to supervise financial service providers to IRAs. *Chamber of Commerce*, 885 F.3d at 364. Moreover, Title II fiduciaries to IRAs do not have duties of loyalty and prudence. *Id.* Instead, Title II authorized the Treasury Department, through the IRS, to impose an excise tax on "prohibited transactions" involving fiduciaries of IRAs. 26 U.S.C. §4975(a), (b). The Department of Labor is

6

authorized only to grant exemptions from the prohibited transactions provision, *id.* §4975(c)(2), 29 U.S.C. §1108(a), and to "define accounting, technical and trade terms" that appear in both laws, 29 U.S.C. §1135.

In 1975, a year after ERISA was passed, the Department of Labor promulgated a five-part test for determining who is a "fiduciary" under ERISA and the Code. Under that test, a person who renders investment advice is a "fiduciary" when:

> Such person [1] renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; . . . [2] on a regular basis to the plan [3] pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services [4] will serve as a primary basis for investment decisions with respect to plan assets, and that such person [5] will render individualized investment advice to the plan based on the particular needs of the plan[.]

29 C.F.R. §2510.3-21(c)(1). This definition "captured the essence of a fiduciary relationship known to the common law as a special relationship of trust and confidence between the fiduciary and his client." *Chamber of Commerce*, 885 F.3d at 365.

## II.   The 2016 Fiduciary Rule and the Fifth Circuit's Decision Vacating the Rule

For more than four decades, the Department's five-part test governed who is and is not a "fiduciary" under ERISA and the Code. In 2016, however, the Department issued a package of new rules known as the "Fiduciary Rule." *See*

*Definition of the Term "Fiduciary"; Conflict of Interest Rule – Retirement Investment Advice*, 81 Fed. Reg. 20946 (Apr. 8, 2016). The Fiduciary Rule, among other things, eliminated the "regular basis" requirement (prong two of the five-part test) that had been used by the Department for the previous forty years. *Chamber of Commerce*, 885 F.3d at 366. In its place, the Fiduciary Rule provided that an individual is a fiduciary under ERISA when, among other things, he is "'compensated in connection with a 'recommendation as to the advisability of' buying, selling, or managing 'investment property.'" *Id.* (quoting 29 C.F.R. §2510.3-21(a)(1) (2017)). Through this broad new rule, the Department claimed the authority to regulate "virtually all financial and insurance professionals who do business with ERISA plans and IRA holders." *Id.*

The Department adopted the Fiduciary Rule because, among other reasons, it believed its longstanding rules insufficiently regulated investment decisions to "roll over" assets from a Title I employer-sponsored plan to a Title II IRA plan. *See id.* at 365. An IRA rollover often occurs when an employee retires and moves his funds from an employer-sponsored retirement plan into an IRA. *See id.* Before the Fiduciary Rule, the Department's rules prohibited the agency from regulating these one-time transactions. By requiring that the advice be given to the customer on a "regular basis," the Department's five-part test "excluded one-time transactions like IRA rollovers" from the type of advice that might confer fiduciary status. *Id.*; *see* Fiduciary Rule, 81 Fed. Reg. at 20955 ("One example of the five-part

8

test's shortcomings is the requirement that advice be furnished on a 'regular basis. . . . The 'regular basis' requirement . . . deprives individual participants and IRA owners of statutory protection when they seek specialized advice on a one-time basis . . . (e.g., as in the case of . . . a rollover from a plan to an IRA).''); *see also id.* at 20949 ("Because advice on rollovers is usually one-time and not 'on a regular basis,' it is often not covered by the 1975 standard[.]"). According to the Department, the Fiduciary Rule was needed because individual investors "may be persuaded to engage in [these rollover] transactions" by advisors who have "'conflicts of interest.'" *Id.*

In 2018, however, the U.S. Court of Appeals for the Fifth Circuit vacated the Fiduciary Rule. *Chamber of Commerce*, 885 F.3d at 388. In passing ERISA, the Fifth Circuit explained, Congress had "codified the touchstone of common law fiduciary status—the parties' underlying relationship of trust and confidence." *Id.* at 369. The Fiduciary Rule was inconsistent with this definition because it imposed fiduciary status when there was no "relationship of trust and confidence between the fiduciary and the client." *Id.* at 370. In particular, the Fiduciary Rule improperly dispensed with the "regular basis" prong of the five-part test. "For 41 years, the [Department] employed a five-part test to determine whether a person is an investment-advice fiduciary under ERISA and the Code, and that test limited the reach of the statutes' prohibited transaction rules to those who rendered advice 'on a regular basis.'" *Id.* at 389. The Fiduciary Rule, by contrast, improperly

9

"includ[ed] one-time IRA rollover or annuity transactions where it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers." *Id.* at 380.

By vacating the Fiduciary Rule, the Fifth Circuit's opinion effectively reinstated the 1975 rules governing who is and is not an investment-advice "fiduciary" under ERISA. *See* AR 102 (*Conflict of Interest Rule — Retirement Investment Advice: Notice of Court Vacatur*, 85 Fed. Reg. 40589, 40589 (July 7, 2020)). Following the Fifth Circuit's decision, the Department issued a technical amendment to the Code of Federal Regulations restoring the text of the 1975 rules. *See* AR 102-07. These rules remain in place today.

## III. The Department's 2020 Prohibited Transaction Exemption and Interpretation and the 2021 "Frequently Asked Questions"

Despite the Fifth Circuit's ruling, the Department of Labor continued to believe that it should have regulatory authority over one-time rollover recommendations. In December 2020, the Department issued "Prohibited Transaction Exemption 2020-02," an exemption covering fiduciary investment advice to retirement investors, including in the context of rollovers. *See* AR 65-69; *see also* AR 98-101 (*Notification of Proposed Class Exemption*, 85 Fed. Reg. 40834-01 (July 7, 2020) (proposing the class exemption)). In the preamble to this exemption, the Department announced a new "interpretation" of its existing rules. AR 8-11; *see also* AR 75-76 (proposing to reinterpret the five-part test). According to the

Department, it now believes that the "regular basis" prong can be satisfied "with the occurrence of first-time advice on rollovers" if "an ongoing relationship [later] develops" or "the parties reasonably expect an ongoing advice relationship at the time of the rollover recommendation." AR 9. This interpretation was needed, the Department believed, because deciding to rollover retirements saving out of a Title I plan is "often [the] most important" decision an investor will make. AR 10, 33.

After redefining who will be deemed a "fiduciary," the Department then adopted an exemption to allow these new fiduciaries to receive "otherwise prohibited compensation." AR 65 (Exemption §1(a)). To qualify for the Exemption, financial institutions and investment professionals must, among other things: (1) comply with "Impartial Conduct Standards," which includes providing advice in the "best interest of the retirement investor"; (2) provide various disclosures, including an acknowledgement of fiduciary status; (3) adopt policies and procedures that "mitigate" conflicts of interests; and (4) document the "specific reasons" why any recommendation to roll over assets from an employer-sponsored plan to an IRA is in the best interests of the investor. AR 66-67 (Exemption §2).

Notably, in the preamble to the Exemption, the Department announced a host of obligations that financial institutions and investment professionals needed to take to show the "specific reasons" that a recommendation to roll over assets is

11

in the best interest of a retirement investor. AR 33-35. None of these requirements were in the actual text of the Exemption. *See* AR 65-69.

Five months later, in April 2021, the Department issued a set of "Frequently Asked Questions." AR 1346-61 (*New Fiduciary Advice Exemption: PTE 2020-02 Improving Investment Advice for Workers & Retirees Frequently Asked Questions*, U.S. Dep't of Labor (Apr. 2021)). The FAQs purported to provide "guidance" on the five-part test and the Exemption. AR 1347. Two of these FAQs are challenged here: FAQ 7 and FAQ 15.

**FAQ 7.** Under the Department's regulations, a person is not an investment advice fiduciary unless he renders investment advice "on a regular basis to the plan." 29 C.F.R. §2510.3-21(c)(1). FAQ 7 asks, "When is advice to roll over assets from an employee benefit plan to an IRA considered to be [] on a 'regular basis'?" AR 1351. In its answer, the Department states that the "regular basis" prong can be satisfied for a "recommendation to roll plan assets to an IRA" even when it is the "first instance of advice." *Id.* According to the Department, this type of one-time advice will be the act of a fiduciary if the parties establish an "ongoing advice relationship" after the rollover is completed, or if the financial professional "*expects to* regularly make investment recommendations regarding the IRA" going forward. *Id.* (emphasis added).

Thus, under the Department's pronouncements in FAQ 7, a financial professional can be considered an investment-advice fiduciary when making a

12

rollover recommendation even though he has not provided any advice on "a regular basis to the plan" when the advice is given. The Department's answer to FAQ 7 thus transforms countless one-time rollover recommendations into the acts of a fiduciary, contrary to the Department's prior interpretation of its rules.

**FAQ 15.** The Exemption states that financial institutions must "document[] the specific reasons that any recommendation to roll over assets . . . is in the Best Interest of the Retirement Investor." AR 66 (Exemption §2(c)(3)). The Exemption does not mandate any specific ways in which financial institutions must comply with this documentation requirement.

FAQ 15, however, significantly expands financial institutions' obligations under the Exemption. It asks, "What factors should financial institutions and investment professionals consider and document in their disclosure of the reasons that a rollover recommendation is in a retirement investor's best interest?" AR 1355. In its answer, the Department states that, for recommendations to roll over assets from an employee benefit plan to an IRA, financial institutions and investment professionals must consider and document: (1) "the alternatives to a rollover, including leaving the money in the investor's employer's plan, if permitted"; (2) "the fees and expenses associated with both the plan and the IRA"; (3) "whether the employer pays for some or all of the plan's administrative expenses"; and (4) "the different levels of services and investments available under the plan and the IRA." *Id.*

13

In addition, FAQ 15 states that "[t]o satisfy the documentation requirement for rollovers from an employee benefit plan to an IRA, investment professionals and financial institutions should make diligent and prudent efforts to obtain information about the existing employee benefit plan and the participant's interests in it." *Id.* "If the retirement investor won't provide the information, even after a full explanation of its significance, and the information is not otherwise readily available, the financial institution and investment professional should make a reasonable estimation of expenses, asset values, risk, and returns based on publicly available information." *Id.* The institution and professional then "should document and explain the assumptions used and their limitations." *Id.*

Thus, even though the Exemption requires financial institutions to do nothing more than document their "specific reasons" for recommending a rollover, *see* AR 66, FAQ 15 imposes numerous documentation and investigation requirements that are contained nowhere in the Exemption.

Five months later, on October 25, 2021, the Department issued Field Assistance Bulletin (FAB) 2021-02. *See* AR 108-11 (FAB No. 2021-02 (Oct. 25, 2021)). Pointing to FAQ 15, the Bulletin stated that "financial institutions have expressed concern that they face significant challenges in implementing the rollover documentation and disclosure requirements by the December 20 deadline" and that "these challenges and concerns may delay their ability to rely on the exemption." AR 110. The Department thus found it appropriate to provide

14

"transition relief" from the "documentation and disclosure requirements" it had imposed. AR 110. Specifically, the Department stated that through June 30, 2022, it "will not enforce the specific documentation and disclosure requirements for rollovers." AR 110.

## STANDARD OF REVIEW

Summary judgment is required if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary" or "capricious"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or that was issued "without observance of procedure required by law." 5 U.S.C. §706(2). When reviewing agency action, "the entire case on review is a question of law" and "the district judge sits as an appellate tribunal." *Health Freedom Def. Fund, Inc. v. Biden*, No. 8:21-cv-1693, --- F. Supp. 3d ---, 2022 WL 1134138, at *3 (M.D. Fla. Apr. 18, 2022) (cleaned up) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). "'Summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Id.* (quoting *O.A. v. Trump*, 404 F. Supp. 3d 109, 125 (D.D.C. 2019)). "If a plaintiff 'prevails on its APA claim,' the 'relief under that statute normally will be a vacatur of the agency's order.'" *Id.* (quoting *Am. Bioscience*, 269 F.3d at 1084).

15

## ARGUMENT

I.   **The Department's pronouncements in FAQ 7 violate the APA.**

    A.   **The Department's pronouncements in FAQ 7 improperly amend the Department's rules without notice and comment.**

Under the APA, all "rules" must be issued through a statutorily prescribed notice-and-comment process. *See* 5 U.S.C. §553. Through this process, the APA ensures that "agency regulations are tested via exposure to diverse public comment" and that there is "fairness to affected parties." *Int'l Union*, 407 F.3d at 1259. Rules issued through the notice-and-comment process are often referred to as "'legislative rules'" because they have the "'force and effect of law.'" *Perez*, 575 U.S. at 96. A rule is "legislative"—and thus required to go through the notice-and-comment process—if it "effectively amends a prior legislative rule," "adopts a new position inconsistent with existing regulations," or otherwise "effects a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021, 1024 (D.C. Cir. 2014) (cleaned up). An agency violates the APA if it promulgates a legislative rule without providing public notice and the opportunity to comment. *Id.*

Here, the Department's pronouncements in FAQ 7 are procedurally improper because they effectively amend the Department's existing regulations, adopt a new position inconsistent with existing regulations, and otherwise effect a substantive change in existing law or policy. Under the Department's rules, a financial professional is not a "fiduciary" unless he or she satisfies a five-part test.

16

29 C.F.R. §2510.3-21(c)(1). This test "capture[s] the essence of a fiduciary relationship" by ensuring that there is "a special relationship of trust and confidence between the fiduciary and his client." *Chamber of Commerce*, 885 F.3d at 365. To be a fiduciary under this test, a financial professional must, among other things, "[r]ender[] advice . . . on a *regular basis* to the plan." 29 C.F.R. §2510.3-21(c)(1) (emphasis added).

Because of this "regular basis" prong, the Department never considered one-time rollover recommendations to be a "fiduciary" act. *Chamber of Commerce*, 885 F.3d at 365. Indeed, this is a principal reason why the Department promulgated the Fiduciary Rule in 2016. According to the Department, one of the "shortcomings" of the five-part test was "the requirement that advice be furnished on a 'regular basis'" because this prong "deprives individual participants and IRA owners of statutory protection when they seek specialized advice on a one-time basis," as in the case of "a rollover from a plan to an IRA." *See* Fiduciary Rule, 81 Fed. Reg at 20955; *see also id.* at 20949 ("Because advice on rollovers is usually one-time and not 'on a regular basis,' it is often not covered by the 1975 standard.").

The Department promulgated the Fiduciary Rule to fix this perceived gap. By dispensing with the "regular basis" prong and other criteria, the Fiduciary Rule "encompasse[d] virtually all financial and insurance professionals who do business with ERISA plans and IRA holders," including those who recommend

17

"one-time transactions like IRA rollovers." *Chamber of Commerce*, 885 F.3d at 365-66. As explained, however, the Fifth Circuit found this and other aspects of the rule unlawful and *vacated* the rule, effectively restoring the Department's decades-old "regular basis" requirement. If the Department wanted to again change its definition of "fiduciary," it needed to do so in compliance with the APA—by providing notice that it intended to amend its rules and an opportunity to comment.

Yet the Department didn't do that. Instead, the Department gave notice that it intended to *reinterpret* the "regular basis" prong to no longer exclude one-time rollover advice. *See* AR 75-76. This does not satisfy the notice-and-comment requirements of the APA. An agency cannot amend its rules through an interpretation. Agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez*, 575 U.S. at 101; *see, e.g.*, *York v. Wellmark, Inc.*, No. 16-cv-627, 2017 WL 11261026, at *17 & n.9 (S.D. Iowa) ("[T]he interpretation [in the preamble to a final rule] was not part of the regulatory text and therefore not subjected to notice-and-comment rulemaking, although it was published in the Federal Register and made during the notice-and-comment process.").

*New Hampshire Hospital Association v. Azar* is directly on point. 887 F.3d 62 (1st Cir. 2018). There, the U.S. Department of Health and Human Services posted a set of "Frequently Asked Questions" on its website stating that certain Medicare

18

and private insurance payments should be deducted when determining hospitals' "costs incurred." *Id.* at 68-69. The agency argued that the FAQs were not improper legislative rules under the APA because the agency had already "established the relevant policy in the preamble to [a] 2008 reporting regulation, rather than in its text." *Id.* at 76. The First Circuit rejected this argument. "Although the 2008 *regulation* was subject to notice and comment, the *preamble*, like the FAQs announcement, was not." *Id.* (emphasis added) (citing *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995) (holding that a "preamble has not been subjected to notice and comment.")).

So too here. If the Department wants to change its rules, it must amend its rules through the notice-and-comment process. It cannot do so through an interpretation. Because the Department's pronouncements in FAQ 7 are a legislative rule that did not go through the notice-and-comment process, they violate the APA.

### B. The Department's pronouncements in FAQ 7 are arbitrary and capricious.

The APA requires courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Under the APA, agencies are bound by their own regulations. *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014). An agency's interpretation of its rules is arbitrary and

19

capricious if it is unreasonable or inconsistent with the regulation's plain meaning. *Kisor*, 139 S. Ct. at 2415.

Here, FAQ 7 is inconsistent with the plain language of the Department's regulations for multiple reasons. *First*, FAQ 7 contradicts the Department's existing rules because a one-time rollover recommendation cannot be made "on a regular basis *to the plan*." 29 C.F.R. §2510.3-21(c)(1) (emphasis added). Whether an individual is a "fiduciary" is determined on a plan-by-plan basis. Under ERISA, "a person is a fiduciary *with respect to a plan* to the extent" he, among other things, exercises discretionary control "respecting management *of such plan*," renders investment advice for a fee "with respect to any moneys or other property *of such plan*," or has any discretionary authority "in the administration *of such plan*." 29 U.S.C. §1002(21)(N)(i)-(iii) (emphasis added).

The Department's rules have a similar focus. A person who renders investment advice is a "fiduciary" when "such person [1] renders advice *to the plan* . . . [2] on a regular basis *to the plan* [3] pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person *and the plan* or a fiduciary with respect *to the plan*, that such services [4] will serve as a primary basis for investment decisions *with respect to plan assets*, and that such person will [5] render individualized investment advice *to the plan* based on the particular needs *of the plan*." 29 C.F.R. §2510.3-21(c)(1) (emphasis added).

FAQ 7, however, abandons this plan-specific focus in the context of rollovers. Before a rollover occurs, a professional who gives rollover advice does so with respect to the ERISA-governed plan (*e.g.*, an employer-sponsored, defined-benefit plan). *See* AR 75 ("[A] recommendation to roll assets *out of a Plan* is advice with respect to the moneys or other property *of the Plan*." (emphasis added)); *see also* Fiduciary Rule, 81 Fed. Reg. at 20,964. After the rollover, however, any future advice will be with respect to a *new plan* (*e.g.*, an IRA which contains new assets from the rollover). In other words, the professional's pattern of advice "to the plan" will end as soon as the rollover occurs because the two vehicles for holding retirement assets are different plans. The professional's one-time rollover advice thus cannot be made on a "regular basis to the plan" because it will be the *last advice* that the professional makes "to the plan." 29 C.F.R. §2510.3-21(c)(1). Any further recommendations would be made "to the [new] plan." *Id.* The Department's pronouncement that the "regular basis" prong can be satisfied by a rollover recommendation when it is the "first instance of advice" thus is arbitrary and capricious.

*Second*, FAQ 7 is unreasonable and inconsistent with the Department's rules because the five-part test requires that a person be giving advice on a regular basis *at the time the rollover advice is made*. The Department's rules speak in the present tense. A person is a fiduciary if he "renders" advice on a regular basis—not if he "*will* render" advice or is "expected to" render advice. An agency's "use of a verb

tense is significant in construing" rules. *United States v. Wilson*, 503 U.S. 329, 333 (1992). "The present tense 'in general represents present time.'" *Bonnichsen v. United States*, 367 F.3d 864, 875 (9th Cir. 2004) (quoting R. Pence & D. Emery, *A Grammar of Present Day English* 262 (2d ed. 1963)). By using the present tense, the Department made clear that the advice being given on a regular basis must be "presently existing." *Id.*

Yet under FAQ 7, a rollover recommendation that is not fiduciary investment advice at the time it is given may *become* fiduciary advice if the professional gives additional advice *in the future*. AR 1351. This new standard thus imposes fiduciary status retroactively, which contradicts the plain language of the Department's regulations. Moreover, under FAQ 7, the professional or institution need not even render *any* additional advice in the future to be deemed a "fiduciary." All that is required is that the advisor "expects to" render future advice. AR 1351. But it is inconceivable that an advisor could render advice on a "regular basis to the plan" if no "regular" advice ever occurs. *See Definition of "Regular,"* Merriam-Webster Dictionary, bit.ly/3wxHAw0 (defining "regular" as "recurring . . . at fixed, uniform, or normal intervals").

*Third*, the Department's interpretation is inconsistent with ERISA. As the Fifth Circuit recognized, a person is not a "fiduciary" under ERISA unless there is "a special relationship of trust and confidence between the fiduciary and his client." *Chamber of Commerce*, 885 F.3d at 365. Under FAQ 7, however, a

professional who has no "special relationship of trust and confidence" with the client—because it is the first advice he has ever given the client—can be considered a fiduciary. That flatly contradicts ERISA. Indeed, one of the Fiduciary Rule's principal flaws was that it covered "one-time IRA rollover or annuity transactions where it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers." *Id.* at 380. The Department cannot adopt a new interpretation of its rules that is inconsistent with the governing statutes. *United Farm Workers of Am., AFL-CIO v. Chao*, 227 F. Supp. 2d 102, 108 (D.D.C. 2002).

At bottom, that it took the Department more than "forty years to 'discover' its novel interpretation further highlights the [FAQ's] unreasonableness." *Chamber of Commerce*, 885 F.3d at 380 (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Courts are skeptical of an agency's new interpretation of its rules "when lots of time has passed between the rule's issuance and its interpretation—especially if the interpretation differs from one that has come before." *Kisor*, 139 S. Ct. at 2412. That is precisely what happened here. The Department discovered a new interpretation of its rules only *after* it tried—and failed—to amend them through the notice-and-comment rulemaking process. The Department cannot now "'under the guise of interpreting a regulation . . . create *de facto* a new regulation.'" *Id.* at 2415 (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 588

(2000)). Because the Department's pronouncements in FAQ 7 are arbitrary and capricious, they violate the APA.

## II.   The Department's pronouncements in FAQ 15 violate the APA.

### A.   The Department's pronouncements in FAQ 15 improperly amend the Department's rules without notice and comment.

FAQ 15 is likewise a procedurally improper legislative rule because it imposes new requirements on regulated entities that are not contained in the Exemption's text. Although the Exemption went through notice and comment, *see* AR 98-101; 29 U.S.C. §1108(a), neither the preamble to the Exemption nor the FAQs did, *see N.H. Hosp. Ass'n*, 887 F.3d at 77; *York*, 2017 WL 11261026, at *17 & n.9. The Exemption's documentation requirements are simple and straightforward. Financial institutions need only "document[] the specific reasons that any recommendation to roll over assets . . . is in the Best Interest of the Retirement Investor." AR 66 (Exemption §2(c)(3)). That's it. The Exemption contains no other requirements detailing which factors investment professionals must document, whether they must attempt to obtain information about existing plans or the participants' interests, or whether they must make estimates and assumptions about these interests. *See* AR 65-69. If the Department wanted to include additional obligations, it needed to put them in the text of the Exemption after providing the notice and opportunity to comment required by the APA.

Instead, the Department simply announced a host of new documentation and investigation requirements through FAQ 15. AR 1355. For example, to "satisfy the documentation requirement for rollovers," FAQ 15 requires financial institutions to "make diligent and prudent efforts to obtain information about the existing employee benefit plan and the participant's interests in it." *Id.* If the investor won't provide the information, the financial institution must "make a reasonable estimation of expenses, asset values, risk, and returns based on publicly available information" and "document and explain the assumptions used and their limitations." *Id. None* of these specific obligations are in the Exemption.

FAQ 15 is an improper legislative rule because it "effectively amends a prior legislative rule" by imposing new obligations on regulated entities. *Mendoza*, 754 F.3d at 1024 (cleaned up). Indeed, courts frequently warn against the maneuver the Department made here—"avoid[ing] notice-and-comment rulemaking simply by promulgating a . . . broad regulation . . . and then invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations." *EPIC v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011); *see N.H. Hosp. Ass'n*, 887 F.3d at 75 (same). The entire "purpose of the APA would be disserved" if an agency could misuse guidance documents this way. *EPIC*, 653 F.3d at 7.

Here, the Department adopted the Exemption—a requirement to document "specific reasons" for rollover advice—and then "invok[ed] its power to interpret" the rule to "bind[] the public to a strict and specific set of obligations." *Id.* In other

words, instead of amending the Exemption through notice and comment, the Department simply issued an FAQ. The APA prohibits this end-run around the notice-and-comment process. *See Iowa League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013) ("Expanding the footprint of a regulation by imposing new requirements, rather than simply interpreting the legal norms Congress or the agency itself has previously created, is the hallmark of legislative rules."); *N.H. Hosp. Ass'n*, 887 F.3d at 75 (an agency cannot "simply adopt a regulation parroting the statute, and then reveal its choice through a rule 'interpreting' the regulation"). Because FAQ 15 is a legislative rule that did not go through the proper notice-and-comment process, the Department's pronouncements in FAQ 15 violate the APA.

### B. The Department's pronouncements in FAQ 15 are arbitrary and capricious.

The Department's pronouncements in FAQ 15 are also arbitrary and capricious because they are unreasonable and inconsistent with a plain reading of the Exemption. The Exemption requires financial institutions only to "document[] the specific reasons that any recommendation to roll over assets . . . is in the Best Interest of the Retirement Investor." AR 1355 (Exemption §2(c)(3)). As explained above, however, FAQ 15 goes further and imposes significant new documentation and investigation requirements that are nowhere contained in the Exemption. While a financial institution *could* undertake the expensive and burdensome steps required by FAQ 15, nothing in the Exemption *requires* it to do so.

No reasonable reading of the Exemption supports FAQ 15. The Department cannot use a guidance document to "impose a [requirement] that [the agency] did not include" in the rule itself. *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1102 (11th Cir. 2019). Absent FAQ 15, no regulated entity could ever read the Exemption and independently conclude that it imposed the laundry list of obligations laid out in FAQ 15. *See Mountain States Health All. v. Burwell*, 128 F. Supp. 3d 195, 204 (D.D.C. 2015) ("An interpretive rule 'must derive a proposition from an existing document whose meaning compels or logically justifies the proposition.'" (quoting *Cath. Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010)).

Nor can the Department add such specific obligations through a new "interpretation." "'Nothing is to be added to what the text states or reasonably implies.'" *Gorss Motels*, 931 F.3d at 1102 (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012)). An agency has no power to "'enlarge or improve or change'" the rule through interpretation. Scalia & Garner, *supra*, 93 (citation omitted). Indeed, "the principle that a matter not covered [in a rule] is not covered is so obvious that it seems absurd to recite it." *Yates v. Collier*, 868 F.3d 354, 369 (5th Cir. 2017) (cleaned up) (quoting Scalia & Garner, *supra*, 93).

Here, the Department easily "could have added" specific requirements that investment professionals consider certain factors, attempt to obtain information about existing plans or the participants' interests, or make estimates and

assumptions about these interests Scalia & Garner, *supra*, 95. But "in the absence of such" requirements in the Exemption, the Department "could not create" them through a new "interpretation" of its regulations. *Id.* Because the Department's pronouncements in FAQ 15 are arbitrary and capricious, they violate the APA.

III.   **The Court should declare that the pronouncements in FAQ 7 and FAQ 15 are unlawful, enjoin the Department from enforcing them, and vacate and set them aside.**

A reviewing court must "hold unlawful and set aside agency action[s]" that violate the APA or exceed the agency's authority. 5 U.S.C. §706(2). "Courts have long interpreted this provision as authorizing vacatur." *Health Freedom Def. Fund*, 2022 WL 1134138, at *20. Indeed, "'vacatur . . . is the ordinary APA remedy.'" *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). Courts regularly issue this type of relief for guidance documents that violate the APA. *See, e.g., Mendoza v. Perez*, 72 F. Supp. 3d 168, 175 (D.D.C. 2014) (vacating agency training letters).

In addition to vacatur, the Court should also enjoin the Department from enforcing its unlawful pronouncements in FAQ 7 and FAQ 15. This relief is warranted when agencies issue guidance documents in violation of the APA. *See, e.g., N.H. Hospital* Ass'n, 887 F.3d at 69, 77 (affirming district court's decision "grant[ing] plaintiffs' motion for summary judgment and permanently enjoin[ing] the Secretary from enforcing FAQs 33 and 34"); *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 616-17 (4th Cir. 2018) (affirming district court

order "enjoining the Secretary from enforcing a Medicaid policy set forth in a Frequently Asked Questions document").

Accordingly, the Court should declare that the Department's pronouncements in FAQ 7 and FAQ 15 are unlawful, enjoin the Defendants from enforcing them anywhere in the Department's jurisdiction, and vacate and set them aside.

## CONCLUSION

For the foregoing reasons, the Court should grant ASA's motion for summary judgment.

Respectfully submitted,

Dated: May 20, 2022

 _/s/   J. Michael Connolly_

J. Michael Connolly (*pro hac vice*)
Steven C. Begakis (*pro hac vice*)
Daniel Shapiro (FL Bar #1011108)
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com
daniel@consovoymccarthy.com

*Counsel for Plaintiff American Securities Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

_/s/  J. Michael Connolly_

J. Michael Connolly (*pro hac vice*)