# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| AMERICAN SECURITIES ASSOCIATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 8:22-cv-00330-VMC |
| | ) |
| MARTIN J. WALSH, SECRETARY OF LABOR, and UNITED STATES DEPARTMENT OF LABOR, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' COMBINED CROSS-MOTION TO DISMISS FOR LACK OF JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES..........................................................................................ii

INTRODUCTION.........................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND ........................................................3

REPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS....................9

DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS ..............10

ARGUMENT..............................................................................................................10

I.      THIS COURT LACKS JURISDICTION TO ADJUDICATE PLAINTIFF'S CLAIMS BECAUSE PLAINTIFF HAS NOT SUFFERED A COGNIZABLE INJURY REDRESSABLE BY THE RELIEF IT SEEKS IN THE COMPLAINT........11

        A.      Plaintiff Has Not Suffered a Cognizable Injury in Fact.....................12

                1.      FAQ 7:........................................................................................12

                2.      FAQ 15:......................................................................................14

        B.      Plaintiff's Alleged Injury is Not Traceable to Either FAQ................16

        C.      Any Injury Would Not Be Redressed by a Withdrawal of the FAQs.................19

II.     THE FAQS ARE PROCEDURALLY PROPER INTERPRETIVE RULES .................21

        A.      The FAQs Are Not a Legislative Rule................................................22

        B.      Any Procedural Errors Were Harmless...............................................25

III.    THE FAQS SURVIVE ARBITRARY AND CAPRICIOUS REVIEW, AND DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ..............................27

        A.      The FAQs Align With The Fifth Circuit's Interpretation Of "Fiduciary" Under ERISA And Are Consistent With The Plain Meaning Of The 1975 Regulation....................................................................................27

        B.      To The Extent That The 1975 Regulation Is Ambiguous, The Department's Interpretation Of Its Own Regulations Here Is Entitled To Deference, And Its Interpretation Was Reasonable...........................................33

CONCLUSION...........................................................................................................35

# TABLE OF AUTHORITIES

**CASES**

*Aetna Health Inc. v. Davila*,
   542 U.S. 200 (2004) ................................................................................. 3

*AFL-CIO v. Donovan*,
   757 F.2d 330 (D.C. Cir. 1985) ................................................................ 33

*Ali v. California Field Ironworkers Tr. Fund*,
   No. 09-cv-1031, 2010 WL 358539 (M.D. Fla. Jan. 23, 2010) ................. 3

*Allen v. Wright*,
   468 U.S. 737 (1984) ............................................................................... 16

*Auer v. Robbins*,
   519 U.S. 452 (1997) ........................................................................... 2, 33

*Baker v. Carr*,
   369 U.S. 186 (1962) ............................................................................... 11

*Bochese v. Town of Ponce Inlet*,
   405 F.3d 964 (11th Cir. 2005) ............................................................... 11

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
   451 F.3d 1257 (11th Cir. 2006) ............................................................. 13

*Chamber of Commerce v. U.S. Department of Labor*,
   885 F.3d 360 (5th Cir. 2018) ......................................................... *passim*

*Chen Zhou Chai v. Carroll*,
   48 F.3d 1331 (4th Cir. 1995) ................................................................. 23

*Childrens Hospital of the King's Daughters, Inc. v. Azar*,
   896 F.3d 615 (4th Cir. 2018) ................................................................. 24

*DiMaio v. Democratic Nat'l Comm.*,
   520 F.3d 1299 (11th Cir. 2008) ............................................................. 19

*Fed'n for Am. Immigr. Reform, Inc. v. Reno*,
   897 F. Supp. 595 (D.D.C. 1995) ........................................................... 16

*Fla. Audubon Soc. v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ................................................................ 18

*Gen. Motors Corp. v. Ruckleshaus*,
   742 F.2d 1561 (D.C. Cir. 1984) ............................................................ 22

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ................................................................................ 11

*Greystone Bank v. Tavarez,*
   No. 09-cv-5192, 2010 WL 3325203 (E.D.N.Y. Aug.19, 2010) ............................................ 11

*Hunt v. Hawthorne Assocs., Inc.,*
   119 F.3d 888 (11th Cir. 1997) ............................................................................ 3

*Hunt v. Washington State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ................................................................................ 14

*Iowa League of Cities v. EPA,*
   711 F.3d 844 (8th Cir. 2013) ............................................................................ 23

*Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior,*
   88 F.3d 1191 (D.C. Cir. 1996) ............................................................................ 34

*Kimelman v. Garland,*
   --- F. Supp. 3d ---, 2022 WL 621401 (D.D.C. Mar. 3, 2022) .............................................. 18

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019) ..........................................................................29, 33, 34

*LaRue v. DeWolff, Boberg & Associates, Inc.,*
   552 U.S. 248 (2008) ................................................................................ 30, 31

*League of Women Voters of Fla., Inc. v. Lee,*
   --- F. Supp. 3d. ---, 2022 WL 969538 (N.D. Fla. Mar. 31, 2022) ........................................ 14

*Lockheed Corp. v. Spink,*
   517 U.S. 882 (1996) ................................................................................ 4

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ..........................................................................11, 12, 13, 19

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ................................................................................ 15

*Mahoney v. Nokia, Inc.,*
   444 F. Supp. 2d 1246 (M.D. Fla. 2006), *aff'd*, 236 F. App'x 574 (11th Cir. 2007) ............... 28

*Mendoza v. Perez,*
   754 F.3d 1002 (D.C. Cir. 2014) ............................................................................ 22

*Mertens v. Hewitt Assocs.,*
   508 U.S. 248 (1993) ................................................................................ 3, 27

*Nat. Res. Def. Council v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020)..............................................................22

*National Council for Adoption v. Blinken*,
  4 F.4th 106 (D.C. Cir. 2021).......................................................24, 25

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007)................................................................21, 26

*Nat'l Assoc. for Fixed Annuities v Perez*,
  217 F. Supp. 3d 1 (D.D.C. 2016)..........................................................6

*Nat'l Parks Conservation Ass'n v. Norton*,
  324 F.3d 1229 (11th Cir. 2003)...........................................................11

*New Hampshire Hosp. Ass'n v. Azar*,
  887 F.3d 62 (1st Cir. 2018)..........................................................20, 23

*New Hampshire Hosp. Ass'n v. Burwell*,
  2017 WL 822094 (D.N.H. Mar. 2, 2017).....................................................20

*Perez v. Mortgage Bankers Ass'n*,
  575 U.S. 92 (2015).................................................................22, 26

*POET Biorefining, LLC v. EPA*,
  970 F3d 392 (D.C. Cir. 2020)............................................................22

*Renee v. Duncan*,
  686 F.3d 1002 (9th Cir. 2012)...........................................................19

*Roberts v. Swearingen*,
  358 F. Supp. 3d 1341 (M.D. Fla. 2019)...................................................11

*Rybachek v. U.S. EPA*,
  904 F.2d 1276 (9th Cir. 1990)...........................................................24

*Salmeron-Salmeron v. Spivey*,
  926 F.3d 1283 (11th Cir. 2019)..........................................................26

*Sec'y of Labor v. Fitzsimmons*,
  805 F.2d 682 (7th Cir. 1986).............................................................3

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995)......................................................................21

*Sierra Club v. Morton*,
  405 U.S. 727 (1972).....................................................................13

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .................................................................................... 15

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ................................................................................ 19, 20

*Steele v. Nat'l Firearms Act Branch*,
  755 F.2d 1410 (11th Cir. 1985) .................................................................. 19

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021) ...................................................................... 19

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................................ 12, 15

*Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*,
  411 F.3d 1242 (11th Cir. 2005) ............................................................ 11, 20

*Tex. Children's Hosp. v. Burwell*,
  76 F. Supp. 3d 224 (D.D.C. 2014) .............................................................. 20

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994) .................................................................................... 34

*U.S. Dep't of Labor v. Wolf Run Mining Co., Inc.*,
  446 F. Supp. 2d 651 (N.D. W. Va. 2006) ................................................... 34

*U.S. Steel Corp. v. U.S. EPA*,
  595 F.2d 207 (5th Cir. 1979) ...................................................................... 26

*United States v. Dean*,
  604 F.3d 1275 (11th Cir. 2010) .................................................................. 26

*United States v. Fafalios*,
  817 F.3d 155 (5th Cir. 2016) ...................................................................... 28

*United States v. Schwarzbaum*,
  24 F.4th 1355 (11th Cir. 2022) ................................................................... 21

*Univ. of S. Ala. v. Am. Tobacco Co.*,
  168 F.3d 405 (11th Cir. 1999) .................................................................... 11

*Useden v. Acker*,
  947 F.2d 1563 (11th Cir. 1991) .................................................................... 3

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996) .................................................................................... 27

*Warshauer v. Solis*,
   577 F.3d 1330 (11th Cir. 2009) ........................................................ 22

**STATUTES**

5 U.S.C. § 553 ......................................................................... 2, 21

5 U.S.C. § 706 ............................................................................. 26

26 U.S.C. § 4975 ........................................................................... 5

29 U.S.C. § 1001 ........................................................................ 3, 5

29 U.S.C. § 1002 ............................................................. 2, 4, 30, 31

29 U.S.C. § 1104 ........................................................................ 3, 4

29 U.S.C. § 1106 ........................................................................ 1, 4

29 U.S.C. § 1108 ........................................................................... 5

29 U.S.C. § 1135 ........................................................................... 5

**REGULATIONS**

26 C.F.R. § 54.4975–9 .................................................................... 6

29 C.F.R. § 2510.3-21 .............................................................. *passim*

29 C.F.R. § 2550.404a-5 ............................................................... 35

Definition of Fiduciary,
   40 Fed. Reg. 50840 (October 31, 1975) ............................................ 6

Prohibited Transaction Exemption 2020-02, Improving Investment Advice for Workers &
   Retirees,
   85 Fed. Reg. 82798 (December 18, 2020) ....................................... 1, 9

**OTHER AUTHORITIES**

3 Dan B. Dobbs, et al., *The Law of Torts*, § 697 (2d ed. June 2017 Update) ............................ 13

*"Specific,"* Webster's New World College Dictionary (4th ed.),
   https://www.yourdictionary.com/specific .......................................... 32

## INTRODUCTION

The Department of Labor has broad authority under the Employee Retirement Income Security Act of 1974 ("ERISA") to protect Americans' retirement savings. As part of this authority, ERISA authorizes the Secretary of Labor to grant exemptions that would allow fiduciaries to certain ERISA-qualified retirement plans to receive compensation that would otherwise be prohibited as self-dealing. *See* 29 U.S.C. § 1106(a). Pursuant to this authority, the Department adopted Prohibited Transaction Exemption 2020-02, 85 Fed. Reg. 82798 (December 18, 2020), after publishing a notice in the Federal Register, soliciting comments from interested parties (including Plaintiff here), and holding a public hearing. The Exemption's preamble addressed, among other things, the comments received regarding financial advice provided to retirees in the context of rollovers from ERISA plans to Individual Retirement Accounts ("IRAs") and set forth the Department's interpretation of when such advice would meet the statutory and regulatory definition of fiduciary investment advice. In April 2021, the Department published a series of responses to Frequently Asked Questions ("FAQs") on its website which closely tracked language in the preamble to the Exemption and provided "guidance on [the Exemption] and information on the Department's next steps in its regulation of investment advice." AR 1347.[1]

Plaintiff, the American Securities Association, objects to these FAQs, which discuss situations where investment professionals and broker dealers assume fiduciary obligations in the context of rollover recommendations, where "objective evidence" demonstrates that the parties "mutually intend an ongoing advisory relationship," AR 9-10, even though its members openly admit that they are, in fact, assuming fiduciary obligations in the normal course. However unclear

---

[1] Citations with the prefix "AR" refer to the Administrative Record filed in this case. *See* ECF No. 33. A joint appendix containing portions of the record cited by the parties will be filed on August 26, 2022. *See* ECF No. 34 at 1.

Plaintiff's injuries may be in this scenario, its proposed remedy of enjoining or setting aside two of the Department's FAQs without challenging the underlying, substantive policy that those FAQs embody is downright bizarre.  This Court lacks jurisdiction over this challenge because Plaintiff has failed to identify an injury arising from the two FAQs, and its proposed remedy—aimed only at the FAQs while ignoring the actual Exemption—would do nothing to redress any injury.

Even if this Court has jurisdiction, Plaintiff's claims fail. Plaintiff asserts that the Department failed to engage in notice-and-comment rulemaking when publishing the FAQs, but those FAQs are merely guidance about the interpretation set forth in the Exemption's preamble and thus exempt from the Administrative Procedure Act's ("APA") notice-and-comment rulemaking requirement. 5 U.S.C. § 553(a). Even if the Court somehow found a procedural defect in the promulgation of the FAQs, it would be harmless error given that Plaintiff participated in the notice-and-comment process that led to the publication of the identical guidance in the Exemption's preamble.

On the substance, Plaintiff's claim that the FAQs are arbitrary and capricious is without merit. The interpretation of "fiduciary" included in the Exemption's preamble and the FAQs is consistent with the statutory definition provided in ERISA, *see* 29 U.S.C. § 1002(21)(A), and with the operative regulations promulgated by the Department in 1975, *see* 29 C.F.R. §2510.3-21(c)(1) ("the 1975 regulation"). The plain language of these statutory and regulatory provisions supports the Department's interpretation of investment advice fiduciaries as applied to rollover recommendations. Even if those provisions were ambiguous, the Department's interpretation of its regulations would be subject to deference under *Auer v. Robbins*, 519 U.S. 452 (1997).

This Court should either dismiss this lawsuit for lack of jurisdiction or, if it finds that jurisdiction exists, grant summary judgment to Defendants.

## LEGAL AND PROCEDURAL BACKGROUND

Congress enacted ERISA in 1974 based on its determination that Americans' retirement savings were not adequately protected to their detriment and that of the country.  Pub. L. No. 93-406, 88 Stat. 829, 898 (1974) (codified at 29 U.S.C. §§ 1001, *et seq.*). Prior to ERISA, "federal involvement in the monitoring of pension funds in this country was minimal." *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 689 (7th Cir. 1986).[2] Congress thus enacted ERISA "after determining that the then present system of regulation was ineffective in monitoring and preventing fraud and other pension fund abuses." *Id*. The statutory framework included, *inter alia*, enhanced "disclosure and reporting" requirements, "standards of conduct, responsibility, and obligation for fiduciaries [to] employee benefit plans," and "appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004); *Ali v. California Field Ironworkers Tr. Fund*, No. 09-cv-1031, 2010 WL 358539, at *2 (M.D. Fla. Jan. 23, 2010) (Covington, J.) ("Congress enacted ERISA to protect the interests of participants in employee benefit plans and their beneficiaries").

Title I of ERISA imposes stringent obligations on individuals who engage in important plan-related activities, *i.e.*, "fiduciar[ies]." 29 U.S.C. § 1104. In defining who qualifies as a "fiduciary" under ERISA, Congress took an express statutory departure from the common law understanding of that term, defining "'fiduciary' not in terms of formal trusteeship, but in *functional* terms . . . thus expanding the universe of persons subject to fiduciary duties." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). *See also Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 892 n.2 (11th Cir. 1997) ("The term 'fiduciary' has a broader meaning under ERISA than at common law"); *Useden v. Acker*, 947 F.2d 1563, 1581 (11th Cir. 1991) (emphasizing the "obvious

---

[2] Internal citations, quotations, and alterations are omitted in this brief unless otherwise indicated.

care with which ERISA's remedial provisions are formulated" and noting that "the statute is, in its contours, meaningfully distinct from the body of the common law of trusts.").

Under ERISA, "a person is a fiduciary with respect to a plan to the extent":

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii) *he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan*, or has any authority or responsibility to do so, *or*

(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added). A "fiduciary" under Title I of ERISA must adhere to duties of loyalty and prudence. *Id.* § 1104. The former requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration. *Id.* § 1104(a)(1). The latter requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B).

As an additional protective measure, Congress prohibited fiduciaries from engaging in specified transactions Congress deemed inherently fraught with conflicts of interest. *Id.* § 1106; *see Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996) (Congress's goal was to "bar categorically" transactions likely to injure a plan and its beneficiaries). In particular, a fiduciary must not "deal with the assets of the plan in his own interest or for his own account" or "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(1), (3). Given the breadth of the

prohibited transaction provisions, Congress enumerated statutory exemptions from some of them. *Id.* § 1108(b). In addition, Congress delegated to the Secretary of Labor ("the Secretary") the broad authority to grant "conditional or unconditional" administrative exemptions on a class-wide or individual basis, if the Secretary finds that such an exemption is: (1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of such plan. *Id.* § 1108(a).

In Title II of ERISA, Congress amended the Internal Revenue Code ("the Code") to adopt a "fiduciary" definition parallel to that in Title I.  26 U.S.C. § 4975(e)(3). Title II covers most employee benefit plans covered by Title I, as well as other tax-favored retirement and savings plans (collectively "IRAs"). While the Code provisions do not include duties of loyalty and prudence, they do, as in Title I, prohibit fiduciaries and others from engaging in specified conflicted transactions. *Id.* § 4975(c). The Secretary has the authority to grant administrative exemptions from these Code provisions on the same terms as in Title I.  *Id.* § 4975(c)(2).[3] Those who violate the Code's prohibited transaction provisions are subject to excise taxes enforced by the Internal Revenue Service ("IRS"). *Id.* § 4975(a)-(b).

ERISA also delegated to the Secretary broad authority to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of [Title I of ERISA]." 29 U.S.C. § 1135. "Among other things, such regulations may define accounting, technical and trade terms used in such provisions." *Id.* Pursuant to that authority, the Department in 1975 issued a regulation stating

---

[3] The parallel provisions of Title I of ERISA and § 4975 of the Code led to redundancy. To harmonize their administration and interpretation, President Carter issued Reorganization Plan No. 4 in 1978, 5 U.S.C. App. 1, 29 U.S.C. § 1001 note ("Reorg. Plan"), which Congress ratified in 1984. *See* Pub. L. No. 98-532, 98 Stat. 2705 (1984).  Among other things, the Reorganization Plan transferred to the Department the interpretive, rulemaking, and exemptive authority for the fiduciary definition and prohibited transaction provisions that apply to both employer-based plans and IRAs.  *See* Reorg. Plan § 102 (transferring "all authority of the Secretary of the Treasury to issue [regulations, rulings, opinions, and exemptions under section 4975 of the Code] . . . to the Secretary of Labor").

when a person "renders investment advice for a fee or other compensation" within the meaning of the second prong of the "fiduciary" definition in ERISA. 40 Fed. Reg. 50842 (Oct. 31, 1975).[4] It significantly narrowed the scope of the statutory definition by setting forth a five-part test, under which a person was deemed to "render[] investment advice" when he: (1) renders advice as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property, (2) on a regular basis, (3) pursuant to a mutual agreement, arrangement or understanding, with the plan or a plan fiduciary, (4) where that advice will serve as a primary basis for investment decisions with respect to plan assets, and (5) the advice will be individualized based on the particular needs of the plan. *See* 29 C.F.R. § 2510.3–21(c)(1); *Nat'l Assoc. for Fixed Annuities v Perez,* 217 F. Supp. 3d 1, 23 (D.D.C. 2016).

The 1975 regulation was promulgated before 401(k) plans existed and before IRAs were commonplace, and the market for retirement savings has undergone a dramatic shift since the 1975 regulation was issued. For example, rollovers from ERISA-covered Plans to IRAs were expected to approach $2.4 trillion cumulatively from 2016 through 2020. AR 75. Moreover, "[p]articipants in individual participant-directed defined contribution Plans (DC Plans) and IRA investors are responsible for investing their retirement savings, and they often seek high quality, impartial advice from financial service professionals to make prudent investment decisions." AR 50.

As a result of these changes in market conditions, in 2016, the Department finalized a new regulation that would have replaced the 1975 regulation and granted new associated prohibited transaction exemptions. In 2018, the U.S. Court of Appeals for the Fifth Circuit vacated that rulemaking, including the new exemptions, in *Chamber of Commerce v. U.S. Department of*

---

[4] The 1975 regulation also applies to the definition of fiduciary in the Code, which is identical in its wording. *See* 26 C.F.R. § 54.4975–9(c); 40 Fed. Reg. 50840 (October 31, 1975).

*Labor*, 885 F.3d 360 (5th Cir. 2018). Specifically, the court found that the 2016 rule—which did away with the "regular basis" and "primary basis" prongs of the 1975 rule—was inconsistent with ERISA, and took particular issue with a requirement in the 2016 rulemaking that financial services providers, as a condition for receiving the associated exemption, enter into an enforceable contract with the retirement investor, which would have given IRA investors the right to sue financial institutions and advisers for breach of contract. *See id.* at 366-67.

On July 7, 2020, the Department proposed a new class exemption, which took into consideration the Fifth Circuit's ruling, public correspondence and comments received by the Department since February 2017, and informal industry feedback seeking an administrative class exemption for otherwise-prohibited transactions. *See* AR 70.[5] The Notice "set[] forth the Department's interpretation of the [1975] five-part test of investment advice fiduciary status and provide[d] the Department's views on when advice to roll over Plan assets to an IRA could be considered fiduciary investment advice under ERISA and the Code." AR 71. In light of the Fifth Circuit's ruling in *Chamber of Commerce*, the Notice made clear that:

> [a]ll prongs of the [1975] five-part test must be satisfied for the investment advice provider to be a fiduciary within the meaning of the regulatory definition, including the "regular basis" prong and the prongs requiring the advice to be provided pursuant to a "mutual" agreement, arrangement, or understanding that the advice will serve as "a primary basis" for investment decisions.

AR 75. Additionally, given that "Financial Institutions and Investment Professionals may have a strong economic incentive to recommend that investors roll over assets into one of their Institution's IRAs," AR 81, the Department proposed, for purposes of the exemption, a documentation requirement in connection with a fiduciary rollover recommendation.

---

[5] At the same time, the Department published a technical amendment to the Code of Federal Regulations, implementing the Fifth Circuit's vacatur of the 2016 rulemaking by removing language from the CFR that the 2016 rulemaking added and reinstating the 1975 Regulation. *See* AR 102-207.

The Department received 106 written comments on the proposed exemption from a variety of interested parties. American Securities Association ("ASA"), the Plaintiff here, submitted a comment on August 6, 2020. In that comment, ASA requested that the Department "make explicit that the ERISA 'five-part test' will be consistent with the Fifth Circuit's opinion regarding the 2016 Rule," and argued that requiring broker-dealers to disclose their fiduciary status to investors in the context of rollover recommendations was "unnecessary and could have adverse impacts," and that such "written affirmation requirements" would "add unnecessary subjectivity and complexity." AR 379. Based on the Department's request for comment on "overlapping regulatory requirements" with other agencies, ASA also argued that the Department's regulatory framework in this area should embrace the Securities and Exchange Commission's ("SEC") national Best Interest Standard regulation ("Reg BI") for broker-dealers. AR 380.

Following a public hearing on September 3, 2020—at which commenters were permitted to give additional testimony—the Department published Prohibited Transaction Exemption 2020-02 on December 18, 2020. *See* AR 1. In the preamble to the Exemption, which contained a lengthy discussion of the various comments that were received and the rationale for the Department's decision-making with respect to the Exemption, the Department characterized the preamble and Exemption as its "final interpretation of when advice to roll over Plan assets to an IRA will be considered fiduciary investment advice under Title I and the Code." *Id.* The preamble noted the agency's final view that a one-time rollover recommendation, without other "objective evidence" demonstrating that the parties "mutually intend an ongoing advisory relationship," would not "be considered fiduciary investment advice under the five-part test set forth in the Department's regulation." AR 9-10. The preamble also provided concrete examples of the type of documentation that a fiduciary would be expected to provide in order to "form a prudent recommendation" that

ensures "that a rollover is in the best interest of the Retirement Investor." AR 33-34. Plaintiff filed this lawsuit on February 9, 2022. *See* Compl., ECF No. 1.

## REPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1. Defendants agree that the Prohibited Transaction Exemption 2020-02, Improving Investment Advice for Workers & Retirees, 85 Fed. Reg. 82798 (Dec. 18, 2020), was published on December 18, 2020. *See* AR 1-69. Moreover, as the portion of the Administrative Record relied upon by Plaintiff makes clear, *see* AR 8-11, the 1975 five-part test for fiduciary advice, *see* 29 C.F.R. § 2510.3-21(c)(1), continues to apply under the Exemption. *See* AR 8 ("All the elements of the [1975] five-part test must be satisfied for the investment advice provider to be a fiduciary within the meaning of the regulatory definition, including the 'regular basis' prong . . . ."); AR 9 ("The regulation still requires, in all cases, that advice will be provided on a regular basis. The Department's interpretation merely recognizes that the rollover recommendation can be the beginning of an ongoing advice relationship.").

2. Defendants agree that the Frequently Asked Questions document identified by Plaintiff was published in April 2021. *See* AR 1346. The record is undisputed both from the title of the document—"New Fiduciary Advice Exemption: PTE 2020-02, *Improving Investment Advice for Workers & Retirees*, Frequently Asked Questions"—and on its face that the FAQs were not issued as a standalone document but were issued to "provide guidance on PTE 2020-02 and information on the Department's next steps in its regulation of investment advice," AR 1346-47.

3. Defendants lack knowledge sufficient to form a belief about the truth of the factual allegations advanced by Plaintiff in this paragraph.

4-6. As explained in greater detail below, *see infra* Arg. § I, Defendants believe that Plaintiff has not identified a cognizable, redressable injury to itself or its members by virtue of FAQ 7 and 15, and that the Court therefore lacks subject matter jurisdiction over Plaintiff's claims.

## DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

1.      PTE 2020-02 (the Exemption) went through notice-and-comment rulemaking. AR 70. Plaintiff participated in this notice-and-comment process by submitting a comment expressing its views on, *inter alia*, the application of the 1975 regulation (the five-part test) to rollover recommendations. AR 378.

2.      The preamble to the Exemption "sets forth the Department's final interpretation of the five-part test of investment advice fiduciary status for purposes of this exemption, and provides the Department's views on when advice to roll over Title I Plan assets to an IRA will be considered fiduciary investment advice under Title I and the Code." AR 1.

3.      Plaintiff does not seek relief from the Exemption or the preamble. *See* Compl. ¶¶ 55-97 (Counts I-IV).

4.      The language included in the response to FAQ 7 and FAQ 15 is materially indistinguishable from language included in the preamble. *See infra* Arg. § I.B for side-by-side comparison and corresponding record cites.

5.      The preamble and the FAQs both state that the 1975 regulation and five-part test apply to rollover recommendations. AR 6 (Preamble); AR 1350 (FAQ 6). The preamble and the FAQs both state that furnishing of one-time rollover advice, without more, would not satisfy the "regular basis" prong of the 1975 regulation and would not constitute fiduciary advice. AR 8 (Preamble); AR 1351 (FAQ 7).

## ARGUMENT

The court should either dismiss Plaintiff's claims for lack of subject matter jurisdiction under Rule 12(b)(1) or Rule 12(h)(3), or should grant summary judgment to Defendants under Rule 56 and deny Plaintiff's motion for summary judgment

I.  **THIS COURT LACKS JURISDICTION TO ADJUDICATE PLAINTIFF'S CLAIMS BECAUSE PLAINTIFF HAS NOT SUFFERED A COGNIZABLE INJURY REDRESSABLE BY THE RELIEF IT SEEKS IN THE COMPLAINT**

Plaintiff cannot invoke the jurisdiction of this court unless it "can show 'a personal stake in the outcome of the controversy.'" *Gill v. Whitford,* 138 S. Ct. 1916, 1929 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). A plaintiff's standing to sue "is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims," *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005). Because this requirement "involves the court's competency to consider a given type of case," it "cannot be waived or otherwise conferred upon the court by the parties." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999).

At its "irreducible constitutional minimum," the standing doctrine requires satisfaction of three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendant's challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561; *see also Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1248 n.2 (11th Cir. 2005) ("[T]he burden to establish the existence of federal subject matter jurisdiction rests with the party bringing the claim[.]"). Here, Plaintiff fails each prong of this test, and the Court should dismiss Plaintiff's complaint pursuant to Rule 12(b)(1) for that reason.[6]

---

[6] Alternatively, the court may dismiss the case for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(h)(3). *See Nat'l Parks Conservation Ass'n v. Norton,* 324 F.3d 1229, 1231, 1240 (11th Cir. 2003) (holding that where the court "lacked [federal] subject matter jurisdiction," "[i]nstead of entering summary judgment in favor of appellee, the district court should have dismissed appellants' APA claims, *sua sponte* if necessary, pursuant to Fed. R. Civ. P. 12(h)(3)"). In either event, the result is the same. *See Roberts v. Swearingen*, 358 F. Supp. 3d 1341, 1348 (M.D. Fla. 2019) (Covington, J.) (granting defendant's summary judgment motion "which the Court construes as a Motion to Dismiss for lack of standing under Rules

(*footnote continued on next page*)

### A.   Plaintiff Has Not Suffered a Cognizable Injury in Fact.

Plaintiff's challenge is limited to two FAQs. *See* Compl. ¶¶ 55-97. Even assuming *arguendo* a procedural defect in the promulgation of the FAQs, the Supreme Court has made clear that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Here, Plaintiff was required to establish "by affidavit or other evidence," *Lujan*, 504 U.S. at 561, that it was injured by either FAQ. Plaintiff has failed to do so, and the case should be dismissed for lack of subject matter jurisdiction.

### 1.  FAQ 7:

With respect to FAQ 7, which addresses circumstances under which a first-time provision of advice to roll over assets from a 401(k) into an IRA may be considered fiduciary investment advice, Plaintiff relies on the Declaration of Paul Schultz, Managing Director at Robert W. Baird & Co., as purporting to identity a member of ASA that has been injured by this FAQ. However, Mr. Schultz testifies that his company's mission is "to provide the best financial advice and services to our clients by striving to help them create great outcomes in their financial life and by *always keeping their interests first*." Declaration of Paul Schultz ¶ 3, ECF No. 39-3 ("Schultz Decl.") (emphasis added). Ms. Ashley Palermo, Director of Products and Services at Stephens, Inc., an Arkansas-based investment bank, similarly avers that her financial institution's services "include providing discretionary and non-discretionary *fiduciary investment advice to participants in employee benefit plans* and individual retirement accounts ("IRAs"), including recommendations to roll over an employee benefit plan to an IRA plan held at Stephens."

---

12(b)(1) and 12(h)(3)"); *Greystone Bank v. Tavarez,* No. 09-cv-5192, 2010 WL 3325203, *1 (E.D.N.Y. Aug.19, 2010) ("[T]he distinction between a Rule 12(b)(1) motion and a Rule 12(h)(3) motion is largely academic, and the same standards are applicable to both types of motions.").

Declaration of Ashley A. Palermo ¶ 4, ECF No. 39-4 ("Palermo Decl.") (emphasis added). Mr. Christopher Iacovella, the CEO of ASA, states in his declaration that one of ASA's organizational missions is to "is *to promote trust and confidence among investors*." Declaration of Christopher Iacovella ¶ 3, ECF No. 39-2 ("Iacovella Decl.") (emphasis added). As the Fifth Circuit itself noted in *Chamber of Commerce*, citing a treatise, under common law fiduciaries are, among other attributes, "individuals or corporations who appear to accept, expressly or impliedly, an obligation to act in a position of trust or confidence for the benefit of another." *Chamber of Commerce,* 885 F.3d at 370–71 (quoting 3 Dan B. Dobbs, et al., *The Law of Torts*, § 697 (2d ed. June 2017 Update)). In essence, Plaintiff's evidence is that its members are in the business of behaving as trusted advisors to individual investors to promote their financial goals, including in the context of rollover decisions, satisfying even this aspect of the common law understanding of fiduciary as articulated by the Fifth Circuit. [7]

Plaintiff does not identify how it and its members are injured by a requirement that they behave as fiduciaries, given that is what they claim they are already doing. Indeed, the one member of the organization put forward by ASA as allegedly being injured by FAQ 7, Mr. Schultz, claims that providing fiduciary advice is his company's default business model. Schultz Decl. ¶ 3.   Not surprisingly, there is no precedent for granting a party standing to challenge a regulation that does not materially affect its operations in a manner that causes it injury.  *See, e.g., CAMP Legal Def. Fund, Inc. v. City of Atlanta,* 451 F.3d 1257, 1274 (11th Cir. 2006) (plaintiff "must establish 'by affidavit or other evidence,' that every challenged provision affects" the plaintiff) (quoting *Lujan*, 504 U.S. at 561)); *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972) (affirming "[t]he requirement

---

[7] As explained *infra* Arg. § 3.A, the Department believes the Fifth Circuit erred in its conclusion that ERISA's definition of fiduciary mirrored the common law understanding of that term, and disagrees with that court's cabined analysis of the common law relating to fiduciaries in any event.

that a party seeking review must allege facts showing that he is himself adversely affected").

Nor does FAQ 7 command anything of entities providing routine fiduciary financial advice to retirement plan holders under Title I.  Rather, it is simply guidance regarding an exemption that provides regulated entities with a pathway to avail themselves of a *benefit*; that is, receiving otherwise illegal compensation in circumstances where an advice provider may have a conflict of interest insofar as they are recommending a rollover to an IRA that they themselves supervise, or where they are receiving a commission from a third-party as a result of that recommendation.  *See* AR 30 (noting that "[t]his exemption gives broad relief for a wide range of activities that fiduciaries otherwise would be prohibited from engaging in" and that an investment advice professional engaged "in a relationship that satisfies the five-part test" should comply with certain standards of conduct "if they wish to avail themselves of this particular exemption").  No party is under an obligation to use the Exemption, as the Department noted in the preamble to the Exemption. *See* AR 54 ("Not all entities will decide to use the exemption. Some may instead rely on other existing exemptions that better align with their business models.").

Because ASA has not shown through declarations or other evidence that it or any of its members has been injured by the Department's guidance, ASA lacks associational standing to challenge FAQ 7.  *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (an association has standing to bring suit on behalf of its members" only when "its members would otherwise have standing to sue in their own right"); *League of Women Voters of Fla., Inc. v. Lee*, --- F. Supp. 3d. ---, 2022 WL 969538, at *91 (N.D. Fla. Mar. 31, 2022) ("Accordingly, because DRF has not established that any one constituent would have standing to challenge the drop box provision, DRF has not proved associational standing to challenge that provision").

## 2.  *FAQ 15:*

With respect to FAQ 15, both in the complaint and in its supporting declarations at

summary judgment, Plaintiff asserts generalized allegations that providing documentation to retirement investors in the context of rollover recommendations would incur undue time and expense. *See* Compl. ¶ 54 ("These requirements, however, are burdensome, expensive, and time-consuming."); Schultz Decl. ¶ 13 ("Complying with [the FAQs] would be burdensome, expensive, time-consuming, and unfeasible."). The most detailed factual allegation of injury comes from the Palermo Declaration, which states that providing documentation to prospective clients as to why a "rollover recommendation is in a retirement investor's best interest," AR 1355, would require her company to "purchase expensive software to comply with these requirements and its advisors must devote numerous hours complying with the Department's new documentation requirements." Palermo Decl. ¶ 10. These assertions are inadequate to support standing, for two reasons.

First, this suggestion of additional expense is unduly vague and insufficiently "concrete" for purposes of Article III standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (in addition to being particularized to plaintiff, "[a]n injury in fact must also be 'concrete'"). As Justice Scalia observed, standing is not an "ingenious academic exercise in the conceivable," but instead "requires . . . a factual showing of perceptible harm." *Summers*, 555 U.S. at 499. At summary judgment, more than threadbare assertions of compliance costs are required for Article III standing purposes. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990) ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.")

Second, as with FAQ 7, the documentation requirement described in FAQ 15 does not command anything of any regulated party for purposes of routine business functions but instead conditions receipt of a benefit—the ability to receive otherwise illegal financial compensation—on an individual or organization providing documentation explaining why a rollover is in the

client's best interest.  As Plaintiff's testimony makes clear, it is their business to provide prudent advice in the customer's best interest, something that would necessarily require them to consider the participant's current plan and how it compares to any recommended investments.  Plaintiff has failed to show that any additional expenses incurred in connection with the documentation requirement would be so onerous that they would not be offset by financial gains made by ASA members when they were permitted to receive otherwise-prohibited compensation from third parties for successfully promoting rollover recommendations.

### B.   Plaintiff's Alleged Injury is Not Traceable to Either FAQ.

The traceability inquiry "examines the causal connection between the assertedly unlawful conduct and the alleged injury." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984).  Specifically, "[i]t requires that there be a causal connection between the challenged action and the injury alleged in the complaint." *Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 897 F. Supp. 595, 604 (D.D.C. 1995).  Here, the causation element of Plaintiff's alleged injury is wholly lacking because the FAQs are not a source of standalone policy; rather, they merely restate and synthesize for interested parties the contours of the agency's policy as set forth in the preamble and the Exemption.

In fact, FAQ 7 (concerning rollovers) is virtually a verbatim recitation of the Department's interpretation contained in the preamble, as the table below illustrates.

| Exemption Preamble (AR 8) | FAQ 7 (AR 1351) |
|---|---|
| The Department acknowledges that *a single instance of advice to take a distribution from a Title I Plan and roll over the assets would fail to meet the regular basis prong*. | A *single, discrete instance of advice to roll over assets from an employee benefit plan to an IRA would not meet the regular basis prong* of the 1975 test. |
| However, advice to roll over plan assets can also occur as part of an ongoing relationship or an intended ongoing relationship that an individual enjoys with his or her investment advice provider. | However, advice to roll over plan assets can also occur as part of an ongoing relationship or as the beginning of an intended future ongoing relationship that an individual has with an investment advice provider. |

16

| | |
|---|---|
| In circumstances in which the investment advice provider has been giving advice to the individual about investing in, purchasing, or selling securities or other financial instruments through tax-advantaged retirement vehicles subject to Title I or the Code, the advice to roll assets out of a Title I Plan is part of an ongoing advice relationship that satisfies the regular basis prong. | When the investment advice provider has been giving advice to the individual about investing in, purchasing, or selling securities or other financial instruments through tax-advantaged retirement vehicles subject to ERISA or the Code, the advice to roll assets out of the employee benefit plan is part of an ongoing advice relationship that satisfies the regular basis prong. |
| Similarly, advice to roll assets out of a Title I Plan into an IRA where the investment advice provider has not previously provided advice but will be regularly giving advice regarding the IRA in the course of a more lengthy financial relationship would be the start of an advice relationship that satisfies the regular basis prong. | [W]hen the investment advice provider has not previously provided advice but expects to regularly make investment recommendations regarding the IRA as part of an ongoing relationship, the advice to roll assets out of an employee benefit plan into an IRA would be the start of an advice relationship that satisfies the regular basis requirement. |

A comparison of FAQ 15 and the language in the preamble demonstrates a similar, substantive overlap with no material distinctions:

| Exemption Preamble (AR 33-35) | FAQ 15 (AR 1355) |
|---|---|
| The requirement to document the reasons that a rollover is in the best interest of the Retirement Investor is included . . . to ensure that . . . Investment Professionals take the time to *form a prudent recommendation*… | Financial institutions and investment professionals must consider and document their *prudent analysis of why a rollover recommendation is in a retirement investor's best interest.* |
| With respect to recommendations to roll assets . . . into an IRA, the factors that a Financial Institution and Investment Professional should consider and document include the following: | For recommendations to roll over assets from an employee benefit plan to an IRA, the relevant factors include but are not limited to: |
| alternatives to a rollover, including leaving the money in his or her current employer's Plan, if permitted | the alternatives to a rollover, including leaving the money in the investor's employer's plan, if permitted; |
| the fees and expenses associated with both the Plan and the IRA; | the fees and expenses associated with both the plan and the IRA; |
| whether the employer pays for some or all of the Plan's administrative expenses; | whether the employer pays for some or all of the plan's administrative expenses |
| the different levels of services and investments | the different levels of services and investments available under the plan and the IRA. |

| Exemption Preamble (AR 33-35) | FAQ 15 (AR 1355) |
|---|---|
| available under the Plan and the IRA. | |
| the Department expects that Investment Professionals and Financial Institutions evaluating this type of potential rollover will make diligent and prudent efforts to obtain information about the existing Title I Plan and the participant's interests in it. | investment professionals and financial institutions should make diligent and prudent efforts to obtain information about the existing employee benefit plan and the participant's interests in it. |
| If the Retirement Investor is unwilling to provide the information, even after a full explanation of its significance, and the information is not otherwise readily available, the Financial Institution and Investment Professional should make a reasonable estimation [and] . . . should document and explain the assumptions used and their limitations. | If the retirement investor won't provide the information, even after a full explanation of its significance, and the information is not otherwise readily available, the financial institution and investment professional should make a reasonable estimation . . . [and] should document and explain the assumptions used and their limitations. |

It is thus beyond dispute that, insofar as Plaintiff alleges an injury from the Department's policy judgment with respect to fiduciary advice in the context of rollovers or from the types of documentation the Department has said is appropriate to provide to an investor in connection with such a rollover, that injury is not traceable to the FAQs. This lack of traceability is similar to *Kimelman v. Garland*, --- F. Supp. 3d ---, 2022 WL 621401, at *2 (D.D.C. Mar. 3, 2022), where a convicted felon living in New York challenged federal laws prohibiting the purchase and possession of firearms by felons. Because New York law also prohibited felons from purchasing firearms, the court found that his alleged injury (even if cognizable) was not traceable to federal law. *See id.* ("Kimelman's traceability problem arises because federal law is not the only reason he cannot lawfully purchase or possess a firearm . . . Thus, he cannot show that his alleged harm is fairly traceable to federal law."). In ASA's case, even assuming that the FAQs *restate* existing Department policy, the injury is not causally traced to the FAQs given that the overall policy is articulated in the preamble and the Exemption—which Plaintiff does not challenge here. *Fla.*

18

*Audubon Soc. v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996) ("Not to require that a plaintiff show that its particularized injury *resulted from the government action at issue* would effectively void the particularized injury requirement.") (emphasis added).

### C.   Any Injury Would Not Be Redressed by a Withdrawal of the FAQs.

Similar to the traceability problem, Plaintiff also lacks standing because the relief it seeks—declaratory and injunctive relief that would enjoin or set aside the FAQs—would not provide redress for its alleged injuries.   Redressability requires that it is "likely, as opposed to merely speculative, that the injury will be 'redressed by a favorable decision." *Lujan*, 504 U.S. at 561. Courts "must be able "to ascertain from the record whether the relief requested is likely to redress the alleged injury," *Steele v. Nat'l Firearms Act Branch*, 755 F.2d 1410, 1415 (11th Cir. 1985). *See also DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1303 (11th Cir. 2008) (dismissing complaint for lack of standing because it did not "suggest in any way how [the] 'injury' could be redressed by a favorable judgment").

Here, any judicial order setting aside the FAQs would not provide redress because virtually identical language exists in the preamble to the Exemption, which was published in the Federal Register and which explains at great length the Department's thinking on the application of the 1975 five-part test to rollover recommendations.   Yet Plaintiff challenges only the FAQs and not the virtually identical language in the preamble accompanying the Exemption, which constitutes the Department's "final interpretation of when advice to roll over Plan assets to an IRA will be considered fiduciary investment advice under Title I and the Code," AR 1.  The civil plaintiff "is the 'master of his complaint' and "determines the claims . . . to bring." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 728 (4th Cir. 2021).  Therefore, for the claims brought and the relief sought here, a judicial ruling setting aside the subsequent guidance contained in the FAQs would leave the Exemption and the text of the preamble intact, meaning that any injunctive or

declaratory relief against the FAQs would not change Plaintiff's legal position or redress its alleged injuries. *See Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (for redressability, plaintiffs "need [to] show that there would be a change in a legal status"); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 n.5, 107 (1998) (plaintiff must show that he "personally would benefit in a tangible way from the court's intervention" and "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court.").

The situation here is unlike the litigation relied upon by ASA regarding two FAQs issued by the Centers for Medicare and Medicaid Services (CMS). *See* ASA Br. at 18-19, ECF No. 39 (discussing *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018)). For those CMS FAQs, there was no antecedent indication from the agency as to its views on calculating the Medicaid payments at issues, and thus, as one district court found, "FAQ 33 is the only thing standing between the plaintiffs and redress of their injuries." *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 239 (D.D.C. 2014); *see also New Hampshire Hosp. Ass'n v. Burwell*, 2017 WL 822094, at *7 (D.N.H. Mar. 2, 2017) ("If FAQs 33 and 34 are unenforceable, however, the audit of Fiscal Year 2011 based on FAQs 33 and 34 is no longer accurate," further noting that "Defendants do not explain why [the state agency] would recoup funds from plaintiff hospitals if no overpayments were made"). In other words, because the FAQs were the only source relied upon by the state agency for its effort to recoup overpayments, enjoining the FAQs would tend to redress Plaintiff's injuries insofar as they were predicated on that audit.

The upshot of these cases is simple: where FAQs merely encapsulate an agency's pre-existing regulatory enactments, setting aside those FAQs would do nothing to address any alleged injury that actually arises from the substantive enactments. They are, after all, just FAQs.

Here, because the relief that Plaintiff seeks against the FAQs would leave it in the exact same position as it is currently, Plaintiff lacks standing and the case should be dismissed for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h); *Sweet Pea Marine,* 411 F.3d at 1248 n.2 (plaintiff bears "the burden to establish the existence of federal subject matter jurisdiction.").

## II.      THE FAQS ARE PROCEDURALLY PROPER INTERPRETIVE RULES

Should the Court conclude that Plaintiff's claims are properly before it, Defendants are entitled to summary judgment on Plaintiff's procedural APA claims (Counts I and III) because the challenged FAQs are interpretive rules exempt from the APA's notice-and-comment rulemaking procedures. *See* 5 U.S.C. § 553(b)(A) (APA's notice-and-comment requirement "does not apply . . . to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.")  Rather than effecting a substantive change in policy, the FAQs by their own terms are an interpretative rule that "provide[s] guidance on [the Exemption] and information on the Department's next steps in its regulation of investment advice," AR 1347, particularly with respect to application of the 1975 five-part test to rollover recommendations. The FAQs are thus the "prototypical example of an interpretive rule issued by an agency to advise the public of its construction of the statutes and rules it administers," *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995), specifically ERISA and the 1975 regulation.

Moreover, even if Plaintiff's procedural arguments with respect to the FAQs had merit, the due process concerns underlying the notice-and-comment requirement for legislative rules are plainly absent here, where the FAQs are identical in all material respect to the text of the preamble of the Exemption, a document that reflected the exhaustive notice-and-comment period in which Plaintiff itself participated.  Because ASA *did* participate in the notice-and-comment process that led to the preamble and the Final Exemption, and because the FAQs merely restate agency guidance already discussed in the preamble, the "[a]bsence of . . . prejudice" is "clear," which in

21

turn justifies application of the harmless error rule. *United States v. Schwarzbaum*, 24 F.4th 1355, 1366 (11th Cir. 2022); *see Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659–60 (2007) ("In administrative law . . . there is a harmless error rule.").

### A.   The FAQs Are Not a Legislative Rule.

Plaintiff's argument that that the FAQs were "procedurally improper because they effectively amend the Department's existing regulations," ASA Br. at 16, does not withstand scrutiny. The FAQs are a nationally applicable guidance document interpreting an aspect of a prior legislative rule—the 1975 regulation.  Similar guidance documents have regularly been upheld as interpretive rules exempt from notice-and-comment rulemaking requirements. *See POET Biorefining, LLC v. EPA*, 970 F3d 392, 408 (D.C. Cir. 2020).

The Supreme Court has stated that "the critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015); *see also Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) ("Interpretative rules are those that clarify a statutory or regulatory term, remind parties of existing statutory . . . duties, or merely track[] preexisting requirements and explain something the statute or regulation already required."). Here, the FAQs neither amend a prior regulation nor announce a change in policy; they merely "provide guidance on PTE 2020-02 and information on the Department's next steps in its regulation of investment advice," AR 1347.  They therefore "advise the public of the agency's construction of . . . rules which it administers," *Perez,* 575 U.S. at 97—namely the 1975 regulation and the Exemption. *See also Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (an interpretive rule "derive[s] a proposition from an existing document," such as a statute, regulation, or judicial decision, "whose meaning compels or logically justifies the proposition.").

As a starting point, it is appropriate for courts to consider the agency's own characterization

of its action as legislative or interpretive. *See Warshauer v. Solis,* 577 F.3d 1330, 1337–38 (11th Cir. 2009) ("it is relevant that the Secretary characterizes the rule as interpreting" a statutory provision); *see also Gen. Motors Corp. v. Ruckleshaus,* 742 F.2d 1561, 1565 (D.C. Cir. 1984) (*en banc*) (noting that the "starting point" of the analysis is the agency's characterization of the rule); *Iowa League of Cities v. EPA,* 711 F.3d 844, 872 (8th Cir. 2013) (noting that "agency's characterization of its rule as legislative or interpretative, while not dispositive, is entitled to deference"). Here, the text of the FAQs makes clear that the agency was interpreting an existing regulation and giving guidance to market participants on how the Department would interpret the 1975 regulation and its five-part test for purposes of implementing the Exemption, in effect providing "a clarification or explanation of an existing statute or rule." *Chen Zhou Chai v. Carroll,* 48 F.3d 1331, 1341 (4th Cir. 1995).

The FAQs by their own terms interpret the 1975 regulation and its application to fiduciary investment advice, including in the context of rollover decisions. For example, the response to FAQ 1 in the same document—"Why did the department grant PTE 2020-02?"—notes that "[t]he preamble to the new exemption makes clear that the 1975 fiduciary regulation can extend to advice to roll assets out of a plan to an IRA and the exemption provides relief for prohibited transactions resulting from such advice." AR 1347. Indeed, the FAQs are replete with citations to the 1975 regulation. *See, e.g.,* AR 1350 (FAQ 6) ("All parts of the 1975 test must be satisfied for a firm or investment professional to be an investment advice fiduciary when making a recommendation."); AR 1351 (FAQ 8) ("In applying the 1975 test, the Department intends to consider the *reasonable* understandings of the parties based on the totality of the circumstances.").

Given the clear references to the 1975 regulation, Plaintiff's reliance on *New Hampshire Hospital Ass'n v. Azar,* 887 F.3d 62 (1st Cir. 2018), is misplaced. There, the First Circuit noted

that "in announcing and explaining the FAQs, the Secretary offered no meaningful hint that the Secretary derived the policy announced in the FAQs from an interpretation of the statute or the regulation." *Id.* at 72. Here, of course, the FAQs refer to the 1975 regulation as the source of the agency's five-part test for fiduciary status. In *Children's Hospital of the King's Daughters, Inc. v. Azar*, a Fourth Circuit case interpreting the same set of FAQs as those in *New Hampshire Hospital Ass'n*, the court noted that "neither [the] specific provision in the preamble nor the preamble in general" addresses the issue raised in the FAQs. 896 F.3d 615, 621–22 (4th Cir. 2018).

Here, by contrast, the Notice of Proposed Exemption clearly spelled out that the Department was seeking to provide regulatory clarity following the Fifth Circuit's *Chamber of Commerce* decision and was seeking comments on the Proposed Exemption, including "the Department's interpretation of the five-part test of investment advice fiduciary status" and "the Department's views on when advice to roll over Plan assets to an IRA could be considered fiduciary investment advice under ERISA and the Code." AR 71. The preamble to the Final Exemption contains a detailed discussion of the comments received in response to the notice, including comments on application of the 1975 five-part test to rollovers. *See* AR 2-51. Plaintiff's reliance on cherry-picked language from *New Hampshire Hospital Association*—where the Court observed that the preamble to a prior CMS rule was not subject to notice-and-comment rulemaking—ignores a critical distinction to the present case: here, the preamble to the Final Exemption is itself a discussion of all of the comments received on the application of the 1975 regulation (and the five-part test) to rollover recommendations, an APA rulemaking process in which Plaintiff participated. To the extent that Plaintiff objects to the fact that the *preamble*, which included a summary of a notice-and-comment process, did not go through *another* round of notice-and-comment, the law demands no such endless cycle. *See Rybachek v. U.S. EPA*, 904 F.2d 1276,

1286 (9th Cir. 1990) ("The [plaintiffs'] unviolated right was to comment on the proposed regulations, not to comment in a never-ending way on the EPA's responses to their comments.").

Similarly instructive is *National Council for Adoption v. Blinken*, 4 F.4th 106, 114–15 (D.C. Cir. 2021). There, the Department of State issued guidance on international adoption fee schedules in a response to Frequently Asked Questions posted on the Department of State's website. The FAQs had the effect of prohibiting the referral of certain children to certain parents for purposes of adoptions, particularly so-called "soft referrals." The DC Circuit found the FAQs procedurally invalid because the State Department "had never before announced a categorical prohibition on the two types of soft referrals the Guidance prohibits. In fact, it's doubtful State had ever even published rules mentioning 'soft referrals,' much less categorically prohibiting any." *Id.* at 114. The Court also noted that "when the Guidance appeared on State's website, some adoption agencies didn't know what a 'soft referral' was." *Id.*

Here, by contrast, the 1975 regulation has been on the books for decades, and the Department published a Notice of Proposed Class Exemption which sought public comment on the application of the 1975 regulation to, *inter alia*, recommendations to roll over assets from a ERISA-covered plan to an IRA. AR 76. Following that public comment period, the Department issued the Final Exemption and explained in great detail its reasons for doing so. In contrast to *National Council for Adoption*, where the State Department "never said it was clarifying or interpreting specific provisions of a treaty, statute, or regulation," *Nat'l Council for Adoption,* 4 F.4th at 115, here the Department of Labor put interested parties on notice that it would be announcing guidance on the application of the 1975 regulation to rollovers, solicited public comments on this proposal, and explained its interpretation in light of the comments received.

### B.    Any Procedural Errors Were Harmless.

Plaintiff's procedural objections to the FAQs are also unavailing for a second reason:

because the FAQs in question are virtually identical to language that was included in the preamble to the Exemption, which *did* go through a notice-and-comment rulemaking procedure in which Plaintiff itself participated, any procedural errors in the publication of the FAQs are harmless given that prior participation. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 659–60.

Indeed, as explained *supra* Arg. § I.B, the responses to FAQ 7 and 15 are virtually verbatim recitations of the Department's explanation for how it would apply the 1975 regulation to first-time financial advice given in the context of a rollover under certain conditions, along with the documentation that a financial advisor should provide to the retirement investor in order to make sure that the rollover is in his or her best interest. Given the similar language in the notice and the preamble to the Final Exemption, it is plainly not the case that the "agency's decision to issue an interpretive rule, rather than a legislative rule" was "driven [] . . . by a desire to skirt notice-and-comment provisions." *Perez*, 575 U.S. at 105. Quite the opposite.

Because Plaintiff participated in the notice-and-comment process that led to the preamble and the Exemption, it cannot claim to have been prejudiced by any error resulting from a failure to submit the FAQs to an additional round of notice-and-comment rulemaking. *See* 5 U.S.C. § 706 (APA instructs courts to take take "due account ... of the rule of prejudicial error."); *see also United States v. Dean*, 604 F.3d 1275, 1288 (11th Cir. 2010) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."). Given ASA's own participation in the rulemaking process that led to the Exemption preamble and the identical FAQs, the "absence of ... prejudice" is "clear." *U.S. Steel Corp. v. U.S. EPA*, 595 F.2d 207, 215 (5th Cir. 1979). *See also Salmeron-Salmeron v. Spivey*, 926 F.3d 1283, 1286 (11th Cir. 2019) (harmless-error applies where "a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision").

III.   **THE FAQS SURVIVE ARBITRARY AND CAPRICIOUS REVIEW, AND DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT**

Plaintiff's substantive APA claims also fail.  First, Plaintiff's suggestion of incongruity between the FAQs and prior statutes and regulations does not hold water.  Indeed, the plain meaning of ERISA and the 1975 regulations supports the interpretation included in the FAQs, and that interpretation is also in accord with the Fifth Circuit's opinion in *Chamber of Commerce*. Second, and alternatively, to the extent that the definition of "regular basis" under the 1975 regulations is ambiguous, the Department's interpretation of its own regulations is entitled to deference, and the interpretation is reasonable in any event.

A.   **The FAQs Align With The Fifth Circuit's Interpretation Of "Fiduciary" Under ERISA And Are Consistent With The Plain Meaning Of The 1975 Regulation.**

In *Chamber of Commerce*, the Fifth Circuit held that ERISA's definition of fiduciary incorporated the common law of trusts, necessitating "a special relationship of trust and confidence between the fiduciary and his client." *Chamber of Commerce*, 885 F.3d at 365. The Department continues to believe that ruling was in error because the Supreme Court had previously concluded that Congress took an express statutory departure from the common law understanding of that term, defining "'fiduciary' not in terms of formal trusteeship, but in *functional* terms . . . thus expanding the universe of persons subject to fiduciary duties." *Mertens*, 508 U.S. at 262, 264; *see also Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) ("ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection.").

Nevertheless, the Department took special pains to address the Fifth Circuit's concerns in its subsequent promulgation of the Exemption so as to bring the Department's regulation of fiduciary investment advice in line with the Fifth Circuit's interpretation of ERISA's text. Though Plaintiff's brief argues that the FAQs are inconsistent with *Chamber of Commerce* based purely

on the Department's view that in *some cases*, advice to roll over assets from an ERISA plan to an IRA might meet the definition of fiduciary investment advice, in fact Plaintiff overreads *Chamber of Commerce* as precluding for all time the regulation of rollover recommendations.

The Fifth Circuit opinion does no such thing. Rather, the Fifth Circuit held that the 2016 Fiduciary Rule was inconsistent with ERISA's text in part because it "expressly includes one-time IRA rollover or annuity transactions where it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers." 885 F.3d at 380. For purposes of the FAQs at issue here, the Department agrees and stated on a number of occasions in the preamble and the FAQs that a one-time rollover recommendation, without other "objective evidence" demonstrating that the parties "mutually intend an ongoing advisory relationship," AR 9-10, would not "be considered fiduciary investment advice under the five-part test set forth in the Department's regulation." AR 7; *see also* AR 1351 (FAQ 7) ("A single, discrete instance of advice to roll over assets from an employee benefit plan to an IRA would not meet the regular basis prong of the 1975 test."). This approach—under which "the Department intends to consider the *reasonable* understandings of the parties based on the totality of the circumstances" to determine whether a fiduciary relationship exists—is entirely consistent with the approach taken by the Fifth Circuit. *Id.*[8]

---

[8] Moreover, in addition to reinstating the 1975 regulation in full, the Department elected to jettison from the Exemption several elements of the 2016 Fiduciary Rule and associated exemption that the Fifth Circuit found objectionable. For example, under the 2016 Rule, fiduciaries that received conflicted compensation were required to enter into an enforceable contract with the advice recipient as a condition for relief from the prohibited transaction provisions that otherwise barred the compensation, and the 2016 Rule gave IRA investors the right to sue financial institutions and advisers for breach of contract. The Fifth Circuit found that contractual requirement to be inconsistent with Congressional intent under Title II, *see Chamber of Commerce*, 885 F.3d at 381-82. The Exemption here does not include a contract requirement, nor does it create a private right of action. Moreover, the 2016 rule also limited an investment adviser's ability to require an advice recipient to agree to binding, pre-dispute arbitration, which the Fifth Circuit found in *dicta* likely violated the Federal Arbitration Act, *see id.* at 385.

In addition to its consistency with the plain meaning of "fiduciary investment-advice" as used in ERISA, the FAQs also comport with the plain text of the 1975 regulation. Regulations are interpreted "in the same manner as statutes, looking first to the regulation's plain language." *United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016); *accord Mahoney v. Nokia, Inc.*, 444 F. Supp. 2d 1246, 1257 (M.D. Fla. 2006), *aff'd*, 236 F. App'x 574 (11th Cir. 2007). Before determining that a regulation is ambiguous, however, courts must also "make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2424 (2019).

Here, the 1975 regulation defines a "fiduciary" as one who "(1) renders advice to the plan as to the value of securities or other property, or makes *recommendation[s] as to the advisability of investing in, purchasing, or selling securities or other property*," (2) "*on a regular basis*," (3) "pursuant to a mutual agreement, arrangement or *understanding*," with the plan or a plan fiduciary that (4) the "advice will serve as *a primary basis* for investment decisions with respect to plan assets," and (5) the advice *will be individualized* "based on the particular needs of the plan." 29 C.F.R. § 2510.3-21(c)(1) (emphasis added); *see also* AR 293, AR 489-90. The Department's interpretation that a first-time provision of investment advice to rollover assets, when "objective evidence" demonstrates that the parties "mutually intend an ongoing advisory relationship," AR 9-10, is consistent with that regulatory "text, structure, history, and purpose." *Kisor*, 139 S. Ct. at 2424. In a fiduciary rollover scenario, the financial advisor is "render[ing] advice . . . as to the advisability . . . or selling securities or other properties" from the ERISA plan; has begun to provide such advice "on a regular basis" given the mutual expectation of an ongoing relationship; is doing so "pursuant to a mutual . . . understanding,"; is providing advice that will be *a* "primary basis" for the rollover decision; and is providing "individualized" advice. 29 C.F.R. § 2510.3-21(c)(1).

Plaintiff's contrary arguments lack merit. *First*, Plaintiff falls back on the demonstrably incorrect assertion that the Department's view would sweep in all one-time IRA rollover or annuity transactions. ASA Br. at 8, 10, 23. In fact, the preamble and the FAQs all make plain that the 1975 five-part test needs to be satisfied in full and that a one-time rollover recommendation, without something more, would fail to satisfy the regular basis test.[9] In fact, the Department received and rejected one comment suggesting "that a rollover transaction should always satisfy the regular basis prong on the grounds that it can be viewed as involving two separate steps—the rollover and a subsequent investment decision." AR 7. Instead, the Department's view for purposes of the exemption was that "[t]hese two steps do not, in and of themselves, establish a regular basis." *Id.* Plaintiff's strawman assertion that all one-time rollovers are covered is simply belied by the record.

*Second*, Plaintiff contends that a financial advisor's act of providing advice in connection with a rollover cannot be made "on a regular basis to the plan," 29 C.F.R. §2510.3-21(c)(1), because "[a]fter the rollover, however, any future advice will be with respect to a *new plan*." ASA Br. at 21. Under Plaintiff's telling, the position of trust and confidence inherent in person-to-person fiduciary relationships—not to mention the accepted statutory purpose behind ERISA to protect the retirement savings of individual Americans—takes a back seat to the needs of ERISA *plans*. But plans in this context are artificial entities comprised of money or property belonging to individuals, as ERISA's statutory definition of "fiduciary" makes plain. *See* 29 U.S.C. § 1002(21)(A)(ii) (a fiduciary "renders investment advice for a fee or other compensation, direct or indirect, *with respect to any moneys or other property of such plan.*") (emphasis added).

---

[9] *See* AR 7 (Exemption Preamble) ("The Department agrees that not all rollover recommendations can be considered fiduciary investment advice under the five-part test set forth in the Department's regulation. Parties can and do, for example, enter into one-time sales transactions in which there is no ongoing investment advice relationship, or expectation of such a relationship."); AR 1351 (FAQ 7) ("A single, discrete instance of advice to roll over assets from an employee benefit plan to an IRA would not meet the regular basis prong of the 1975 test").

Indeed, the Supreme Court has rejected such a myopic focus on *plans* to the exclusion of the money or property that make up a particular ERISA plan. In *LaRue v. DeWolff, Boberg & Associates, Inc.*, the court rejected a ruling by the Fourth Circuit which had found that Section 502(a)(2) of ERISA—which authorizes civil actions against fiduciaries for breach of fiduciary duties and resulting harm to ERISA plans—"provides remedies only for entire plans, not for individuals." 552 U.S. 248, 250 (2008). Instead, the court held that "although § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *Id.* at 256. *See also id.* at 262 (Thomas, J., concurring) ("The question presented here, then, is whether the losses to petitioner's individual 401(k) account resulting from respondents' alleged breach of their fiduciary duties were losses 'to the plan.' In my view they were, because the assets allocated to petitioner's individual account were plan assets."). Here, of course, individual retirement assets included in an ERISA plan—which would be the very assets subject to a rollover—plainly constitute "*moneys or other property of such plan*" as used in the statutory definition of "fiduciary" under ERISA. *See* 29 U.S.C. § 1002(21)(A)(ii) (emphasis added). The 1975 regulation reflects a similar focus on plan assets and property. *See* 29 C.F.R. § 2510.3–21(c)(1) (fiduciary "makes recommendations as to the advisibility of investing in, purchasing, or selling securities or *other property*"); *see also id.* (fiduciary's advice is designed to serve as a primary basis for investment decisions "with respect to *plan assets*.").

Moreover, Plaintiff's argument would lead to absurd outcomes because the five-part test for fiduciaries appears *both* in Title I and the Code. In the case of a rollover, the "advice is rendered to the exact same Retirement Investor (first as a Plan participant and then as IRA owner), and the IRA assets are derived, in the first place, from that Retirement Investor's Title I Plan account."

AR 10. It would make no sense to treat someone who would satisfy the fiduciary definition with respect to the Title II plan *following* the rollover as exempt from fiduciary status with respect to the original rollover recommendation. *See id.* ("A different outcome could all too easily defeat legitimate investor expectations of trust and confidence by arbitrarily dividing an ongoing relationship . . . and uniquely carving out rollover advice from fiduciary protection.")

*Third,* Plaintiff argues unpersuasively that the "regular basis" prong must be satisfied in advance of the rollover recommendation and that the Department's interpretation would impose retroactive fiduciary status. ASA Br. at 22. Given that the same five-part test appears in Title II, a financial advisor recommending a rollover to an IRA housed at his or her financial institution would almost certainly meet the definition of fiduciary with respect to the IRA, and it would be patently inconsistent with ERISA's purposes to exempt the initial rollover recommendation from fiduciary status when the formation of the relationship of trust and confidence in the IRA plan is the precise point of the exercise. Moreover, a broker-dealer engaging in a one-time transaction need not worry about fiduciary status under the Department's interpretation.

*Fourth*, Plaintiff's argument that FAQ 15 is at odds with the text of the Exemption is unpersuasive. The Exemption requires, as a condition for receiving otherwise-prohibited compensation, that an investment professional "document[] the specific reasons that any recommendation to roll over assets . . . is in the Best Interest of the Retirement Investor." AR 66 (Exemption §2(c)(3)). Here, the exemplar documents described in FAQ 15 (and in the preamble) are a logical interpretation of what a fiduciary might reasonably be expected to provide in order to explain "the specific reasons" that a rollover is in "the Best Interest of the Retirement Investor." *Id.* The use of the word "specific" suggests more than a mere assertion that a rollover is in a person's best interest. *See "Specific,"* Webster's New World College Dictionary (4th ed.),

https://www.yourdictionary.com/specific (last accessed June 22, 2022) ("specifying or specified; precise, definite, explicit.")  Here, it strains credulity to think that, in providing a retirement investor with the "specific reasons" for why a rollover recommendation of a lifetime of savings is in his best interest, an advisor would not have to discuss "alternatives to a rollover," the "fees and expenses" associated with both plans, and the "different levels of services and investments available" under the two plans. *See* AR 1355 (FAQ 15). Nor could an advisor possibly provide "specific reasons" why an IRA rollover was in an investor's best interest if the advisor did not "make diligent and prudent efforts to obtain information about the existing employee benefit plan and the participant's interests in it." *Id.*

For these reasons, the Department's views on the application of the "regular basis" prong to rollover recommendations is consistent with the text, structure, and purpose of ERISA and the 1975 regulations, and the documentation requirement is consistent with the requirement in the Exemption that "specific reasons" be provided to an investor in order to explain that a rollover is in his or her best interest. AR 66.

## B. To The Extent That The 1975 Regulation Is Ambiguous, The Department's Interpretation Of Its Own Regulations Here Is Entitled To Deference, And Its Interpretation Was Reasonable.

Assuming the court finds the 1975 regulation ambiguous with respect to whether the "regular basis" prong can be satisfied on objective evidence that a rollover recommendation is the start of a fiduciary relationship with respect to the new plan, an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Kisor*, 139 S. Ct. at 2412 ("We have explained *Auer* deference (as we now call it) as rooted in a presumption about congressional intent—a presumption that Congress would generally want the agency to play the primary role in

resolving regulatory ambiguities.")[10] Such deference is particularly appropriate in specialized regulatory fields where the agency's expertise warrants a special role in interpreting prior regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("This broad deference is all the more warranted when . . . the regulation concerns a complex and highly technical regulatory program."). Additionally, when an agency discusses its views on a prior regulation in the context of a preamble to a new regulation, that preamble can have "independent legal effect," *Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*, 88 F.3d 1191, 1223 (D.C. Cir. 1996), or may also inform the proper interpretation of a regulation. *See U.S. Dep't of Labor v. Wolf Run Mining Co., Inc.*, 446 F. Supp. 2d 651, 654 (N.D. W. Va. 2006). The Supreme Court has recently clarified that the application of *Auer* deference turns on whether "a regulation is genuinely ambiguous." *Kisor*, 139 S. Ct. at 2414.

Here, assuming the 1975 regulation is ambiguous with respect to the "regular basis" prong, the Department's interpretation in FAQ 7 is reasonable and entitled to deference. As an initial matter, the Department received considerable public comment on the importance of rollover decisions for plan participants and the need for greater safeguards in this area to protect retirement investors. *See* AR 158 (Comment from Committee on Investment of Employee Benefit Assets) ("Defined contribution 401(k) plans are an increasingly important source of retirement income and investing, and rollover decisions for the average saver can be daunting. As such, the average 401(k) participant needs both advice from trusted experts *and* safeguards from conflicted advice when considering whether and how to rollover their retirement savings."). Some commenters suggested

---

[10] Though Plaintiff has waived any argument that the Exemption and preamble are arbitrary and capricious under the APA, such an argument would encounter its own set of deference doctrines for purposes of judicial review. *See AFL-CIO v. Donovan*, 757 F.2d 330, 343 (D.C. Cir. 1985) (where "[t]he Secretary is expressly delegated the authority to grant [an] exemption and is required to make certain other determinations in order to do so. That grant and those determinations have legislative effect, are thus entitled to great deference under the 'arbitrary and capricious' standard.").

doing away with the regular basis prong altogether. *See* AR 203 (Comment from Morningstar, Inc.) ("The broader applicability of the standard in the Proposed Rule is necessary to prevent investors from receiving conflicted advice. Conflicted advice has been linked to millions of Americans rolling over low-cost 401(k) accounts into higher-cost IRAs and investing in funds with higher expense ratios and loads."). The Department appropriately balanced comments on both sides of the issue, retained the 1975 five-part test, explained that one-off rollover recommendations would not qualify, and required objective evidence of an intent to establish an ongoing relationship of trust and confidence prior to finding fiduciary status.

Similarly, with respect to FAQ 15, assuming the Exemption's guidance that an investor "document[] the specific reasons that any recommendation to roll over assets . . . is in the Best Interest of the Retirement Investor," AR 66, is ambiguous, the Department's interpretation in the preamble and in the FAQs of the type of documentation that fiduciaries should strive to provide is patently reasonable and entitled to deference. As previously noted, *see supra* at 32-33, the required documentation comprises the very type of information that a reasonable investor would expect to receive in connection with deciding whether a rollover was in his best interest.

Plaintiff's protestation that information about the current plan may not be available to the financial advisor, *see* Palermo Decl. ¶ 11, misses the mark for two reasons. First, in general, such information *should be readily available* as a result of Department regulations mandating disclosure of Plan-related information to the Plan's participants. *See* 29 § C.F.R. 2550.404a-5. Second, if it is not, fiduciaries are permitted to "make a reasonable estimation of expenses, asset values, risk, and returns based on publicly available information." AR 1355.

## CONCLUSION

For the foregoing reasons, Defendants are entitled to dismissal or summary judgment on all claims, and the Court should deny Plaintiff's motion for summary judgment.

Dated: June 24, 2022                         Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             Principal Deputy Assistant Attorney General

                                             BRAD P. ROSENBERG
                                             Assistant Branch Director

                                             */s/ Alexander N. Ely*
                                             GALEN N. THORP
                                             Senior Trial Counsel
                                             ALEXANDER N. ELY
                                             Trial Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L Street NW, Washington, DC 20005
                                             Tel: (202) 993-5177; Fax: (202) 616-8470
                                             alexander.n.ely@usdoj.gov

                                             *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on June 24, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants.

                                             */s/ Alexander N. Ely*
                                             Alexander N. Ely

                                             *Counsel for Defendants Department of Labor and Martin J. Walsh*