```
              UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
                    TAMPA DIVISION

AMERICAN SECURITIES
ASSOCIATION,

     Plaintiff,

v.                                Case No. 8:22-cv-330-VMC-CPT

UNITED STATES DEPARTMENT OF
LABOR, et al.,

     Defendants.
_____/
```

## ORDER

This matter comes before the Court upon consideration of Plaintiff American Securities Association's Motion for Summary Judgment (Doc. # 39), filed on May 20, 2022, and Defendants United States Department of Labor and Marty Walsh's Amended Motion to Dismiss for Lack of Jurisdiction or, in the Alternative, for Summary Judgment (Doc. # 49), filed on June 30, 2022. All Motions have been fully briefed (Doc. ## 49, 50, 53) and are ripe for review. For the reasons that follow, Defendants' Motion to Dismiss is denied, and both summary judgment Motions are granted in part and denied in part.

## I.   **Background**

This case arises out of a challenge to guidance promulgated by the Department of Labor interpreting its Prohibited Transaction Exemption 2020-02, 85 Fed. Reg. 82798 (December 18, 2020) (the "2020 Exemption"). The 2020 Exemption governs the circumstances in which financial institutions and investment professionals who provide "fiduciary investment advice" to retirement investors can "receive otherwise prohibited compensation." (JA Doc. # 54-1 at 66).

### A.   **ERISA**

Congress enacted the Employee Retirement Income Security Act of 1974 ("ERISA") following a determination that Americans' retirement savings were not adequately protected. Pub. L. No. 93-406, 88 Stat. 829, 898 (1974) (codified at 29 U.S.C. §§ 1001, et seq.). ERISA's statutory framework includes enhanced "disclosure and reporting" requirements, "standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans," and "appropriate remedies, sanctions, and ready access to Federal courts." 29 U.S.C. § 1001(b); Ali v. California Field Ironworkers Trust Fund, No. 8:09-cv-1031-VMC-EAJ, 2010 WL 358539, at *2 (M.D.

Fla. Jan. 23, 2010) (citing Aetna Health, Inc. v. Davila, 542 U.S. 200, 208 (2008)).

Title I of ERISA imposes stringent obligations on fiduciaries of employee benefit plans. See 29 U.S.C. § 1104 (detailing fiduciary duties under ERISA). An individual is a fiduciary with respect to a plan under ERISA to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A).

In general, under ERISA, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration. Id. § 1104(a)(1). A fiduciary must also act "with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" Id. § 1104(a)(1)(B).

In addition to imposing duties of care and loyalty on fiduciaries, ERISA categorically precludes fiduciaries from engaging in certain transactions. Id. § 1106. In particular, a fiduciary must not "deal with the assets of the plan in his own interest or for his own account" or "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." Id. § 1106(b)(1), (3). However, ERISA includes exemptions from section 1106 prohibitions for specified transactions, and authorizes the Secretary of Labor to grant "conditional or unconditional" administrative exemptions. Id. § 1108(a), (b). The Secretary may do so on a class-wide or individual basis, so long as the Secretary finds such an exemption is: "(1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of such plan." Id. § 1108(a).

In Title II of ERISA, Congress amended the Internal Revenue Code ("the Code") to adopt a "fiduciary" definition parallel to that in Title I. 26 U.S.C. § 4975(e)(3). Title II covers most employee benefit plans covered by Title I, as well as other tax-favored retirement and savings plans (collectively "IRAs"). Id. While the Code provisions do not include duties of loyalty and prudence, they do, as in Title I, prohibit fiduciaries and others from engaging in specified conflicted transactions. Id. § 4975(c). The Secretary has the authority to grant administrative exemptions from these Code provisions on the same terms as in Title I. Id. § 4975(c)(2).

B.   **The 1975 Regulation**

ERISA also empowers the Secretary to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter." 29 U.S.C. § 1135. "Among other things, such regulations may define accounting, technical and trade terms used in such provisions." Id. Pursuant to that authority, the Department of Labor issued a regulation in 1975 "clarify[ing] the definition of the term 'fiduciary' as set forth in [29 U.S.C. § 1002(21)(A)]." 40 Fed. Reg. 50842 (Oct. 31, 1975) (the "1975 Regulation"). Under the 1975 Regulation, a person "renders investment advice" within the meaning of 29 U.S.C. § 1002(21)(A)(ii) when he:

5

> (1) renders advice to the plan as to the value of securities or other property, or makes recommendation[s] as to the advisability of investing in, purchasing, or selling securities or other property, . . . (2) on a regular basis[,] (3) pursuant to a mutual agreement, arrangement, or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, (4) [where] that the advice given will serve as a primary basis for investment decisions with respect to plan assets, and (5) [where] the advice will be individualized . . . based on the particular needs of the plan.

Nat'l Assoc. for Fixed Annuities v. Perez, 217 F. Supp. 3d 1, 23 (D.D.C. 2016) (citing 29 C.F.R. § 2510-21(c)(1)) (internal quotations omitted)). The 1975 Regulation also applies to the definition of fiduciary in the Code, which is identical in its wording. 26 C.F.R. § 54.4975-9(c); 40 Fed. Reg. 50840 (October 31, 1975).

C.   **The Fiduciary Rule and 2020 Exemption**

In 2016, in response to changes in market conditions since 1975, the Department finalized a new regulation intended to replace the 1975 Regulation. Definition of the Term "Fiduciary"; Conflict of Interest Rule—Retirement Investment Advice, 81 Fed. Reg. 20946 (Apr. 8, 2016) (the "Fiduciary Rule"). In part, the Fiduciary Rule was animated by concern over how the "regular basis" and "primary basis" prongs of the 1975 Regulation would exclude one-time

transactions, like IRA rollovers, from the definition of fiduciary. Chamber of Commerce v. U.S. Dep't of Labor, 885 F.3d 360, 365-66 (5th Cir. 2018). The Fiduciary Rule provided in relevant part that an individual "renders investment advice for a fee" whenever he is compensated in connection with a "recommendation as to the advisability of" buying, selling, or managing "investment property." 29 C.F.R. § 2510.3-21(a)(1) (2017). And "[c]ritically, the [Fiduciary Rule] dispense[d] with the 'regular basis' and 'primary basis' criteria used in the [1975 Regulation.]" Chamber of Commerce, 885 F.3d at 366. The Fiduciary Rule additionally granted new associated prohibited transaction exemptions. Id.

However, in 2018, the Fifth Circuit vacated the Fiduciary Rule. See Chamber of Commerce, 885 F.3d at 379, 388 (holding that the Fiduciary Rule conflicted with plain text of ERISA). Accordingly, on July 7, 2020, the Department proposed a new class exemption, taking the Fifth Circuit's ruling into account. (Joint Appendix ("JA") Doc. # 54-1 at 71). The notice additionally "set[] forth the Department's final interpretation of when advice to roll over Plan assets to an IRA will be considered fiduciary investment advice under Title I and the Code." (Id.). The notice also made clear that:

> [a]ll prongs of the [1975] five-part test must
> be satisfied for the investment advice
> provider to be a fiduciary within the meaning
> of the regulatory definition, including the
> "regular basis" prong and the prongs requiring
> the advice to be provided pursuant to a
> "mutual" agreement, arrangement, or
> understanding that the advice will serve as "a
> primary basis" for investment decisions.

(Id. at 76). The Department concurrently published a technical amendment to the Code of Federal Regulations, "reflect[ing] the Fifth Circuit's vacatur of the Fiduciary Rule . . . and reinstat[ing] the 1975 Regulation[.]" (Id. at 104). Therefore, the definition of "fiduciary" in the 1975 Regulation is currently the operative definition.

During the notice-and-comment period, the American Securities Association submitted a comment on August 6, 2020, requesting the Department "make explicit that the ERISA 'five-part test' will be consistent with the Fifth Circuit's opinion regarding the 2016 Rule." (Id. at 134). ASA further argued that requiring broker-dealers to disclose their fiduciary status to investors in the context of rollover recommendations was "unnecessary and could have adverse impacts," and that such "written affirmation requirements" would "add unnecessary subjectivity and complexity." (Id.).

The Department published Prohibited Transaction Exemption 2020-02 on December 18, 2020 (the "2020

Exemption"), following a public hearing on September 3, 2020. (Id. at 2, 4). Broadly speaking, the 2020 Exemption permits financial institutions and investment professionals who provide "fiduciary investment advice" to retirement investors to "receive otherwise prohibited compensation." (Id. at 66). The 2020 Exemption's relief "extends to prohibited transactions arising as a result of investment advice to roll over assets from a Plan to an IRA" as well as allowing financial institutions "to engage in principal transactions with Plans and IRAs in which the Financial Institution purchases or sells certain investments from its own account." (Id. at 3–4).

To qualify under the 2020 Exemption, financial institutions and investment professionals, must, among other requirements: (1) comply with "Impartial Conduct Standards," which include providing advice that is in the "best interest of the retirement investor;" (2) provide various disclosures, including a written acknowledgement of fiduciary status; (3) adopt policies and procedures that "mitigate" conflicts of interests; and (4) document the "specific reasons" for the rollover recommendation prior to engaging in the rollover. (Id. at 67).

Further, in the preamble to the 2020 Exemption, the Department stated the notice "sets forth the Department's final interpretation of when advice to roll over Plan assets to an IRA will be considered fiduciary investment advice under Title I and the Code." (Id. at 2). The Department notes, "[t]he regulation still requires, in all cases, that advice will be provided on a regular basis" and explains its interpretation "merely recognizes that the rollover recommendation can be the beginning of an ongoing relationship." (Id. at 9). According to the Department, the regular basis prong is thus satisfied "when the parties reasonably expect an ongoing advice relationship at the time of the rollover recommendation." (Id.). Accordingly, the Department emphasizes that "the five-part test does not provide that the first instance of advice in an ongoing relationship is automatically free from fiduciary obligations." (Id. at 10).

### D.   **Department of Labor FAQs**

In April 2021, the Department issued a set of Frequently Asked Questions ("FAQs") addressing, among other issues, (1) when advice to roll over assets from an employment benefit plan to an IRA will be considered to be on a "regular basis" under the Department's rules; and (2) what factors financial

institutions and investment professionals must consider and document when disclosing the "specific reasons" that a rollover recommendation is in a retirement investor's best interest. (Id. at 186–201).

Specifically, FAQ 7 asks: "When is advice to roll over assets from an employee benefit plan to an IRA considered to be on a 'regular basis?'" (Id. at 191). The answer provides:

> A single, discrete instance of advice to roll over assets from an employee benefit plan to an IRA would not meet the regular basis prong of the 1975 test. However, advice to roll over plan assets can also occur as part of an ongoing relationship or as the beginning of an intended future ongoing relationship that an individual has with an investment advice provider. When the investment advice provider has been giving advice to the individual about investing in, purchasing, or selling securities or other financial instruments through tax-advantaged retirement vehicles subject to ERISA or the Code, the advice to roll assets out of the employee benefit plan is part of an ongoing advice relationship that satisfies the regular basis prong. Similarly, when the investment advice provider has not previously provided advice but expects to regularly make investment recommendations regarding the IRA as part of an ongoing relationship, the advice to roll assets out of an employee benefit plan into an IRA would be the start of an advice relationship that satisfies the regular basis requirement. The 1975 test extends to the entire advice relationship and does not exclude the first instance of advice, such as a recommendation to roll plan assets to an IRA, in an ongoing advice relationship.

(Id.).

FAQ 15 asks: "What factors should financial institutions and investment professionals consider and document in their disclosure of the reasons that a rollover recommendation is in a retirement investor's best interest?" (Id. at 195). The answer provides, that "[f]inancial institutions and investment professionals must consider and document their prudent analysis of why a rollover recommendation is in a retirement investor's best interest." (Id.). Per the answer, the relevant factors to consider include but are not limited to:

> the alternatives to a rollover, including leaving the money in the investor's employer's plan, if permitted; the fees and expenses associated with both the plan and the IRA; whether the employer pays for some or all of the plan's administrative expenses; and the different levels of services and investments available under the plan and the IRA.

(Id.). The answer further provides:

> When considering the alternatives to a rollover, the financial institution and investment professional generally should not focus solely on the retirement investor's existing investment allocation, without any consideration of other investment options in the plan. For rollovers from another IRA or from a commission-based account to a fee-based arrangement, a prudent recommendation would include consideration and documentation of the services under the new arrangement.

(Id.). Additionally, per the answer, "[t]o satisfy the documentation requirement for rollovers from an employee benefit plan to an IRA, investment professionals and financial institutions should make diligent and prudent efforts to obtain information about the existing employee benefit plan and the participant's interests in it." (Id.).

FAQ 15 also details the information investment advisors should consider before recommending a rollover. (Id.). Specifically, "investment professionals and financial institutions should make diligent and prudent efforts to obtain information about the existing employee benefit plan and the participant's interests in it." (Id.). If such information is not readily available, "the financial institution and investment professional should make a reasonable estimation of expenses, asset values, risk, and returns based on publicly available information. The financial institution and investment professional should document and explain the assumptions used and their limitations." (Id.).

**E.   The Parties**

The American Securities Association ("ASA") is a trade association of regional financial services firms. (Iacovella Decl. Doc. # 39-2 at ¶ 3). According to ASA, its mission is

to "promote trust and confidence among investors, facilitate capital formation, and support efficient and competitively balanced capital markets." (Id.).

Two members of ASA purport to be injured by the policies set forth in FAQ 7 and 15. Paul Schultz is the General Counsel and a Managing Director at Robert W. Baird & Co. Inc. ("Baird"). (Schultz Decl. Doc. # 39-3 at ¶ 2). Baird is a wealth management, asset management, and investment banking/capital markets firm serving individuals, corporations, and institutions globally. (Id. at ¶ 3). Baird is a member of ASA. (Id. at ¶ 5). According to Mr. Schultz, because of the Department's guidance, Baird prohibits its investment advisors from recommending that an investor roll over assets out of an employee benefit plan. (Id. at ¶ 8). Mr. Schultz explains that "[a]bsent the Department's pronouncements, Baird would allow its investment advisors, when appropriate, to recommend that investors roll over assets out of an employee benefit plan, even if it was the advisor's first contact with the investor." (Id.). Mr. Schultz further states that "[c]omplying with the Department's pronouncements would be burdensome, expensive, time-consuming, and unfeasible." (Id. at ¶ 13). Thus, "[b]ecause of the Department's pronouncements, Baird will not

14

utilize the Exemption to engage in the activities that the Exemption explicitly permits. Absent the Department's pronouncements, Baird would utilize the Exemption to engage in the activities that the Exemption permits." (Id. ¶ 14).

Ashley A. Palermo is the Director of Products & Services, Private Wealth Management, at Stephens, Inc. (Palermo Decl. Doc. # 39-4 at ¶ 2). Stephens is a full-service broker-dealer and investment bank providing investment advisory services to retail and institutional clients. (Id. at ¶ 4). Stephens is a member of ASA. (Id. at ¶ 5). According to Stephens, it must "purchase expensive software to comply with [the 2020 Regulation] and its advisors must devote numerous hours complying with the Department's new documentation requirements." (Id. at ¶ 10).

ASA initiated this action against the Department of Labor on February 9, 2022, asserting two counts under 5 U.S.C. § 706(2)(D) (Counts I and III) and two counts under 5 U.S.C. § 706(2)(A) (Counts II and IV). (Doc. # 1). On May 20, 2022, ASA filed a motion for summary judgment. (Doc. # 39). The Department responded on June 30, 2022, and filed a motion to dismiss, or, in the alternative, for summary judgment. (Doc. # 49). Both motions are fully briefed (Doc. ## 50, 53) and are ripe for review.

## II.  <u>Legal Standard</u>

### A.  <u>Motion to Dismiss</u>

Motions filed under Federal Rule of Civil Procedure 12(b)(1) question this Court's jurisdiction over the subject matter of the case. And Rule 12(h)(3) provides: "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Thus, the Court may consider motions to dismiss for lack of subject matter jurisdiction at any time.

Motions to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) may attack jurisdiction facially or factually. <u>Morrison v. Amway Corp.</u>, 323 F.3d 920, 924 n.5 (11th Cir. 2003). In factual attacks, the Court delves into the arguments asserted by the parties and the credibility of the evidence presented. <u>Garcia v. Copenhaver, Bell, & Assocs.</u>, 104 F.3d 1256, 1260–61 (11th Cir. 1997). As stated in <u>Morrison</u>, "Factual attacks challenge subject matter jurisdiction in fact, irrespective of the pleadings. In resolving a factual attack, the district court may consider extrinsic evidence such as testimony and affidavits." 323 F.3d at 925. In deciding a motion to dismiss filed under Rule 12(b)(1), this Court is not required to assume that the allegations in the Complaint are true.

Rosenkrantz v. Markopoulos, 254 F. Supp. 2d 1250, 1251 (M.D. Fla. 2003); see also Goodman v. Sipos, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001) (finding that factually-based attacks on subject matter jurisdiction go beyond the pleadings and permit testimony and affidavits to be considered).

A plaintiff bears the burden of demonstrating that the Court has jurisdiction. Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980). Once subject matter jurisdiction has been questioned, a plaintiff is required to "clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." Warth v. Seldin, 422 U.S. 490, 518 (1975).

### B.   Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344

F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed[.]" (citation omitted)).

III. **Analysis**

The Court will address the Department's Motion to Dismiss first, followed by ASA's Motion for Summary Judgment, and then the Department's Motion for Summary Judgment.

A. **The Department of Labor's Motion to Dismiss**

In its motion to dismiss, the Department argues that the Court lacks jurisdiction to adjudicate ASA's claims because ASA lacks standing to challenge FAQs 7 and 15. (Doc. # 49 at 14).

"A plaintiff's standing to bring and maintain her lawsuit is a fundamental component of a federal court's subject matter jurisdiction." Baez v. LTD Fin. Servs., L.P., No. 6:15-cv-1043-PGB-DCI, 2016 WL 3189133, at *2 (M.D. Fla. June 8, 2016) (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013)). The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).

To establish standing, "[t]he plaintiff must have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. "'The party invoking federal jurisdiction

bears the burden of establishing' standing." Clapper, 568 U.S. at 411-12 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).

Injury-in-fact is the most important element. Spokeo, 578 U.S. at 338. An injury-in-fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 339 (quoting Lujan, 504 U.S. at 560). The injury must be "particularized," meaning it "must affect the plaintiff in a personal and individual way." Id. (quoting Lujan, 504 U.S. at 560 n.1). Additionally, the injury must be "concrete," meaning "it must actually exist." Id. A plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." Id. at 341.

"When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or

21

requiring the action will redress it." Lujan, 504 U.S. at 561–62.

When an association is the party bringing suit, it "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 693, 704 (2000).

According to the Department, ASA does not have standing to challenge FAQs 7 and 15 on injury-in-fact, traceability, and redressability grounds. The Court will address each of the Department's arguments in turn.

### 1.   Plaintiff has Suffered a Concrete Injury-in-Fact

#### i.   FAQ 7

With respect to FAQ 7, which addresses the circumstances under which a first-time provision of advice to roll over assets from a 401(k) into an IRA may be considered fiduciary advice, the Department argues that ASA lacks standing because ASA members would act as fiduciaries notwithstanding FAQ 7. Thus, according to the Department, guidance imposing

fiduciary duties on ASA members does not injure them because they act as fiduciaries regardless.

The Court finds that at least one ASA member has suffered a concrete injury-in-fact. As an initial matter, when the plaintiff is "an object of the action (or foregone action) at issue . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." Lujan, 504 U.S. at 561–62. Courts have thus found standing "self-evident" where the plaintiffs were representatives of or they themselves were regulated parties. See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272, 1286–87 (D.C. Cir. 2005) ("We think that it is fairly 'self-evident' that the various appellants as representatives of the regulated parties satisfy the irreducible constitutional minimum of Article III standing." (citations and internal quotations omitted)); Fla. Bankers Ass'n v. U.S. Dep't of the Treasury, 799 F.3d 1065, 1074 n.1 (D.C. Cir. 2015) (Henderson, J., dissenting) ("Standing here is self-evident: banks are the 'object' of the 2012 Rule and their injuries would be redressed if we granted the Associations' requested relief.").

For example, in Dismas Charities, Inc. v. United States Department of Justice, 401 F.3d 666 (6th Cir. 2005), the court assessed a Bureau of Prisons' policy affecting how prisoners were placed in community corrections centers ("CCCs"). The court found that a nonprofit corporation that owned CCCs had Article III standing to challenge the policy on the ground that notice-and-comment rulemaking was required. Id. at 677. Noting that, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy," the court found the procedural requirements of notice and comment protected the corporation's concrete interest in "continuing to provide services to the BOP." Id.

Similarly, in American Petroleum Institute v. Johnson, 541 F. Supp. 2d 165 (D.D.C. 2008), the court analyzed whether members of the American Petroleum Institute ("API") had standing to challenge the EPA's regulatory definition of "navigable waters." API brought suit against the EPA, alleging EPA's new regulation included an "impermissibly broad definition of the statutory term 'navigable waters.'" Id. at 170. The court found API members had standing to bring suit, reasoning that because the statutory definition of navigable waters "directly influences the business decisions

24

of [API members]," API had sufficiently established a concrete injury in fact. Id. at 176.

Here, the declarations of employees at ASA member firms demonstrate they have suffered an injury-in-fact. First and foremost, ASA members are the object of the regulation at issue. FAQ 7 interprets the "regular basis" prong of the definition of a fiduciary promulgated in the 1975 Regulation. (JA Doc. # 54-1 at 191). One ASA member, Baird, is a wealth management firm that works with clients to "identify specific investment goals [and] build an investment strategy." (Schultz Decl. Doc. # 39-3 at ¶ 4). Another ASA member, Stephens, is a full-service broker-dealer and investment bank providing investment advisory services to retail and institutional clients. (Palermo Decl. Doc. # 39-4 at ¶ 4). As entities in the business of providing investment advice, Baird and Stephens are plainly the objects of regulation that expands the definition of a fiduciary.

Further, Baird has suffered an injury-in-fact because it alleges it no longer provides advice pertaining to rollover recommendations as a consequence of the challenged guidance. (Schultz Decl. Doc. # 39-3 at ¶ 8). Like the plaintiff in Dismas, Baird has a concrete interest in providing certain services – here, the provision of advice concerning rollover

25

recommendations. See Dismas, 401 F.3d at 677 (finding the plaintiff had an interest in providing services to the BOP). FAQ 7's gloss on the definition of fiduciary affects that interest because Baird now "prohibits its investment advisors from recommending that an investor roll over assets out of an employee benefit plan." (Schultz Decl. Doc. # 39-3 at ¶ 8). Indeed, like in American Petroleum, the Department's guidance has "directly influence[d] the business decisions" of ASA members. See American Petroleum, 541 F. Supp. 2d at 176 (finding standing where a statutory definition affected the plaintiff's business decisions). Because Baird has elected to no longer provide certain services in response to the Department's guidance, the effect of FAQ 7 on Baird's operational and business decisions is sufficient to establish an injury-in-fact.

Further, because, per ASA, the policy referenced in FAQ 7 enlarges the circumstances in which an investment advisor is subject to fiduciary duties, it subjects ASA members to the increased documentation requirements detailed in FAQ 15. The policy referenced in FAQ 7 deviates from past agency guidance by explaining that the one-time provision of advice to roll over assets from a plan to an IRA can, in certain circumstances, trigger fiduciary duties. (JA Doc. # 54-1 at

191). In short, according to ASA, FAQ 7 permits the imposition of fiduciary duties in circumstances that would not otherwise trigger such duties.

The Court is thus not persuaded by the Department's contention that ASA members would act as fiduciaries notwithstanding the policy referenced in FAQ 7. Even if the Court were to accept the proposition that certain regulated parties would act as fiduciaries regardless of whether they were legally obligated to, FAQ 7 crystalizes that fiduciary status, and thus requires parties seeking to engage in conflicted interest transactions to utilize the 2020 Exemption. Doing so necessarily entails complying with the documentation requirements outlined in FAQ 15, which the Court will discuss below. Because FAQ 7 opens the door to subjecting the regulated parties to the documentation requirements contained in FAQ 15, it injures the regulated parties regardless of whether they would act as fiduciaries in its absence.

In short, FAQ 7 expands the circumstances in which an investment advisor is subject to fiduciary duties under ERISA. As the regulated party, Baird no longer provides rollover recommendations because of this guidance. This is

sufficient to demonstrate that at least one ASA member has suffered an injury-in-fact for standing purposes.

### ii.  **FAQ 15**

Next, as to FAQ 15, the Department asserts that the ASA members' allegations of additional expense are not sufficiently concrete for the purposes of Article III standing. Further, the Department notes that FAQ 15's documentation requirement does not affirmatively command anything of a regulated party; rather, it conditions receipt of a benefit on such documentation. In the eyes of the Department, the exemption confers a significant enough financial gain on those taking advantage of it so as to offset any burdens that increased documentation may impose.

The Court finds that at least one ASA member has suffered a concrete injury-in-fact with respect to FAQ 15. Like with FAQ 7, ASA members are the "object of the action . . . at issue." Lujan, 504 U.S. at 561–62. The 2020 Exemption permits the receipt of otherwise prohibited compensation by financial institutions and investment professionals who provide fiduciary investment advice, including advice to roll over assets from a Plan to an IRA, so long as certain conditions are met. (JA Doc. # 54-1 at 3–4, 66). One such condition is that the providers of advice document the "specific reasons"

28

for the rollover recommendation prior to engaging in the rollover. (Id. at 67). Stephens provides fiduciary advice to participants in Plans and IRAs, "including recommendations to roll over an employee benefit plan to an IRA[.]" (Palermo Decl. Doc. # 39-4 at ¶ 4). Because Stephens "participate[s] in the types of [conduct] that the Regulation seeks to regulate" – here, the provision of advice to roll over assets from a Plan to an IRA – it is plainly the object of the action at issue. Contender Farms, L.L.P. v. U.S. Dep't of Agric., 779 F.3d 258, 266 (5th Cir. 2015).

Further, Stephens has suffered a concrete injury-in-fact in the form of the increased compliance costs and burdens associated with the 2020 Exemption. "An increased regulatory burden typically satisfies the injury in fact requirement." Id. Courts have found Article III standing where a regulated entity "must incur costs to ensure they are properly complying with the terms of a new regulatory regime." Grand River Ent. Six Nations, Ltd. v. Boughton, 988 F.3d 114, 121 (2d Cir. 2021), cert. denied, 211 L. Ed. 2d 473, 142 S. Ct. 755 (2022) (internal quotations omitted); see City of Waukesha v. E.P.A., 320 F.3d 228, 237 (D.C. Cir. 2003) (finding that "significant monitoring, compliance, and disposal costs" were "sufficient to demonstrate injury-in-fact"); Am. Farm Bureau

Fed'n v. U.S. E.P.A., 792 F.3d 281, 293 (3d Cir. 2015) ("These requirements will in turn cause compliance costs for [Plaintiff], a classic injury-in-fact."). Similarly, the Eleventh Circuit has found "allegations of wasted time" sufficient for standing purposes. Salcedo v. Hanna, 936 F.3d 1162, 1172 (11th Cir. 2019). For example, in Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017), the Eleventh Circuit found the plaintiff's allegations that she "lost time . . . attempting to resolve the credit inaccuracies" demonstrated a concrete injury in a suit under the Fair Credit Reporting Act.

Here, the policy referenced in FAQ 15 imposes documentation requirements on those who wish to take advantage of the exemption, including Stephens. According to Stephens, because of FAQ 15, it must "purchase expensive software to comply with these requirements, and its advisors must devote numerous hours complying with the Department's new documentation requirements." (Palermo Decl. Doc. # 39-4 at ¶ 10).

The Department contends that Stephens' allegations are vague and generalized and thus do not sufficiently demonstrate a concrete injury-in-fact. (Doc. # 49 at 20-21). According to the Department, the assertions of compliance

30

costs do not demonstrate a perceptible harm. (Id.). The Court disagrees. First, "if the complainant is 'an object of the action (or forgone action) at issue' — as is the case usually in review of a rulemaking and nearly always in review of an adjudication — there should be 'little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" Fund for Animals, Inc. v. Norton, 322 F.3d 728, 733-34 (D.C. Cir. 2003) (quoting Sierra Club v. E.P.A.., 292 F.3d 895, 900 (D.C. Cir. 2002)). As the object of the challenged guidance, Stephens' standing is thus self-evident. See Nat'l Ass'n of Home Builders, 417 F.3d at 1286-87 (finding standing self-evident where the plaintiff was the regulated party).

Second, the fact that Stephens has not quantified the compliance costs it will incur does not negate standing. An injured party is not required to show "the magnitude of its injury" to establish standing; rather, it is sufficient "that it will be injured." New York v. U.S. Dep't of Lab., 477 F. Supp. 3d 1, 8 (S.D.N.Y. 2020). Indeed, an injury need not be significant to confer standing; "an identifiable trifle" is enough. Common Cause/Ga. v. Billups, 554 F.3d 1340, 1351 (11th Cir. 2009). Therefore, the fact that Stephens has not offered a projection of its compliance costs is of no moment.

31

Stephens' assertion that it will need to purchase expensive equipment to comply with the Department's guidance is sufficient.

Finally, compliance costs notwithstanding, Stephens' assertion that it must devote substantial time to comply with the new documentation requirements establishes an injury in fact. See Pedro, 868 F.3d at 1280 (finding lost time established injury-in-fact in a Fair Credit Reporting Act case).

The Court is similarly unconvinced by the Department's argument that the documentation requirement described in FAQ 15 does not affirmatively command anything of the regulated party but instead conditions receipt of a benefit on providing documentation. (Doc. # 49 at 21). "[T]he fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing." Denney v. Deutsche Bank AG, 443 F.3d 253, 265 (2d Cir. 2006). Although ASA members may very well financially benefit from utilizing the 2020 Exemption, such a benefit does not strip them of the injury associated with the increased compliance costs. The ASA members' injury is the increased burden that the challenged guidance imposes on them. That the injury materializes only when the ASA members concurrently seek a

financial benefit does not change the Court's analysis. See Texas v. United States, 809 F.3d 134, 156 (5th Cir. 2015) ("Our standing analysis is not an accounting exercise[.]" (internal quotations omitted)).

Therefore, the Court finds that at least one ASA member has suffered a concrete injury-in-fact with respect to FAQ 15.

### 2.   Plaintiff's Injuries are Traceable and Redressable

The Department next contends that the traceability and redressability requirements are not met because the language in FAQ 7 and 15 is substantially similar to that set forth in the preamble to the 2020 Exemption and so enjoining the Department's enforcement of the FAQs does not provide relief to ASA members. (Doc. # 49 at 23). ASA's position is that it is not challenging the FAQs themselves; rather, it is challenging the *policies referenced* in FAQ 7 and 15. (Doc. # 50 at 11). According to ASA, its challenge is to the policies embedded in FAQ 7 and 15, not the FAQs themselves – and that these policies are also articulated in the preamble. (Id. at 11–12).

Because ASA's complaint asked the Court to "[d]eclare that the policies referenced in FAQ 7 and FAQ 15" violate the

Administrative Procedure Act, "[e]njoin the Defendants from enforcing . . . the policies referenced in FAQ 7 and FAQ 15," and "[v]acate and set aside the policies referenced in FAQ 7 and FAQ 15," the Department's argument does not persuade the Court. (Doc. # 1 at 23). While ASA's complaint is not entirely consistent as to its characterization of the challenged policies, its prayer for relief is sufficient to convince the Court of its position. (Id.). Because the Court finds that the object of ASA's complaint is the policies that FAQ 7 and 15 reference – policies that are also referenced in the preamble – the Department's traceability and redressability arguments fail in that respect.

Further, the ASA members' injuries are traceable to the challenged policies and redressable by a favorable decision. Mr. Schultz asserts that Baird prohibits investment advisors from recommending that an investor roll over assets out of an employee benefit plan because of the Department's guidance articulated in FAQ 7. (Schultz Decl. Doc. # 39-3 at ¶ 3). According to Mr. Schultz, "[a]bsent the Department's pronouncements, Baird would allow its investment advisors, when appropriate, to recommend that investors roll over assets out of an employee benefit plan, even if it was the advisor's first contact with the investor." (Id. at ¶ 8).

34

Because Baird has ceased providing certain advice because of the policies in FAQ 7, and advisors would engage in the provision of that advice but for the challenged guidance, ASA has demonstrated traceability and redressability with respect to FAQ 7.

Likewise, as to FAQ 15, the compliance costs and lost time are traceable to and would be redressed by a favorable decision. Ms. Palermo asserts that because of the policies referenced in FAQ 15, Stephens' advisors will have to engage in time-consuming tasks and purchase expensive equipment. (Palermo Decl. Doc. # 39-4 at ¶ 10). Ms. Palermo clarifies that "Stephens would not endure these costs and burdens but for the Department's pronouncements about the documentation required to comply with the Exemption." (Id. at ¶ 12). Stephens' injury is thus the direct result of the challenged guidance, fulfilling the traceability and redressability prongs of the standing analysis.

With respect to FAQ 7, ASA has demonstrated that Baird has suffered a concrete injury-in-fact, fairly traceable to the policy referenced in FAQ 7, and which is redressable by a favorable decision. As for FAQ 15, ASA has demonstrated that Stephens has suffered a concrete injury-in-fact, fairly traceable to the policy referenced in FAQ 15, and which is

redressable by a favorable decision. Because at least one ASA member has standing to challenge each of the challenged policies, ASA has associational standing.

The Department's motion to dismiss (Doc. # 49) is thus denied.

**B.    The American Securities Association's Motion for Summary Judgment**

ASA seeks summary judgment on all four counts. (Doc. # 39). The Court will first address ASA's arguments related to FAQ 7 (Counts I and II), before addressing those related to FAQ 15 (Counts III and IV).

**1.    FAQ 7**

**i.    The Policy Referenced in FAQ 7 is a Procedurally Proper Interpretive Rule**

ASA contends that the policy referenced in FAQ 7 improperly amends the Department's rules without notice and comment. According to ASA, the policy referenced in FAQ 7 is a legislative rule, as opposed to an interpretive rule, with the force and effect of law. Thus, ASA maintains, the policy was required to go through the notice-and-comment procedure outlined in 5 U.S.C. § 553. (Doc. # 39 at 16). The Department contends that the policy referenced in FAQ 7 is merely an interpretive rule, and, in the alternative, that any procedural error is harmless. (Doc. # 49 at 2–3).

The Administrative Procedure Act empowers courts to set aside agency actions found to be without observance of procedure required by law. 5 U.S.C. § 706(2)(D). Section 4 of the APA sets out a procedure for "notice-and-comment" rulemaking to which agencies must adhere when engaging in "rule making." Id. § 553(b). Rules that go through the notice-and-comment process are typically referred to as "legislative rules" because they have the "force and effect of law." Perez v. Mortgage Bankers Ass'n, 575 U.S. 92, 96 (2015) (citing Chrysler Corp. v. Brown, 441 U.S. 281, 302-03 (1979)).

In setting forth the notice-and-comment requirements, the APA clarifies that the process does not apply to "interpretative rules." 5 U.S.C. § 553(b)(A). However, the APA does not offer a definition to distinguish an interpretive rule from a legislative rule, and courts have described the distinction between the two as "enshrouded in considerable smog." Gen. Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (quoting Am. Bus. Ass'n v. ICC, 627 F.2d 525, 529 (D.C. Cir. 1980)).

"Nonetheless, there are certain general principles that aid reviewing courts in making the determination whether a given rule is legislative or interpretative." Id. First, while not dispositive, an agency's own characterization of

its rule as legislative or interpretative is relevant. Iowa League of Cities v. E.P.A., 711 F.3d 844, 872 (8th Cir. 2013). Second, "[a]n interpretive rule simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties." Gen. Motors, 742 F.2d at 1565 (internal quotations omitted). In contrast, a rule is legislative if "by its action the agency intends to create new law, rights, or duties[.]" Id.

Furthermore, the characterization of agency guidance as interpretative does not turn on whether the agency's interpretation is correct. See Am. Min. Congress v. Mine Safety & Health Admin, 995 F.2d 1106, 1113 (D.C. Cir. 1993) ("An interpretive rule may be sufficiently within the language of a legislative rule to be a genuine interpretation and not an amendment, while at the same time being an incorrect interpretation of the agency's statutory authority."). "[T]he proper focus of determining whether an agency's act is legislative is the *source* of the agency's action, not the *implications* of that action[.]" Fertilizer Inst. v. U.S. E.P.A., 935 F.2d 1303, 1308 (D.C. Cir. 1991) (emphasis added). Thus, an agency's action will not be legislative solely because it has "the *effect* of creating new duties." Id. (emphasis in original); see Cabais v. Egger, 690

F.2d 234, 238 (D.C. Cir. 1982) ("A statement which is interpretative does not become substantive simply because it arguably contradicts the statute it interprets.").

Here, ASA contends that the policy referenced in FAQ 7 is a legislative rule because it adopts a new position inconsistent with existing regulations, thereby imposing new substantive obligations on the regulated parties. (Doc. # 50 at 16). While the Court recognizes ASA's argument, agency guidance does not become a legislative rule solely because it "arguably contradicts the statute it interprets." Cabais, 690 F.2d at 238. And here, the policy referenced in FAQ 7 is best classified as an interpretive rule.

First, the Department makes clear that it characterizes the policies referenced in the FAQs as interpretive. To introduce the FAQs, the Department notes, "[t]he following FAQs *provide guidance* on PTE 2020-02 and information on the Department's next steps in its regulation of investment advice." (JA Doc. # 54-1 at 187) (emphasis added). And the Department emphasizes in its response to ASA's motion that, in the FAQs, "the agency was interpreting an existing regulation." (Doc. # 49 at 31). While the Department's perspective demonstrates its intent to interpret, rather than legislate, this characterization alone does not end the

Court's inquiry. See Iowa League of Cities, 711 F.3d at 872 (noting an agency's own characterization is not dispositive); Chamber of Commerce v. OSHA, 636 F.2d 464, 468 (D.C. Cir. 1980) ("[W]e do not classify a rule as interpretive just because the agency says it is.").

Second, the challenged guidance does not purport to create a new definition of fiduciary; rather, it "explain[s] something the statute or regulation already required." Mendoza v. Perez, 754 F.3d 1002, 1021 (D.C. Cir. 2014). ASA may – and does – quibble with whether the guidance does so correctly, and the Court will address that argument in the next section. But for the purposes of classifying the guidance, the policy referenced in FAQ 7 serves to "advise the public of the agency's construction of the statutes and rules which it administers." Mortgage Bankers, 575 U.S. at 96 (internal quotation omitted). The policy referenced in FAQ 7 is couched in terms of the "regular basis" prong of the 1975 Regulation, which in turn clarifies the definition of "fiduciary" in ERISA. The challenged guidance does not seek to impose new obligations, or promulgate new substantive policies – rather, it clarifies the scope of an existing definition. Because the policy referenced in FAQ 7 provides

guidance solely with respect to the definition of "regular basis," it is an interpretive, not legislative, rule.

Because the policy referenced in FAQ 7 is an interpretive rule, notice and comment was not required. 5 U.S.C. § 553(b)(3)(A). Accordingly, the policy referenced in FAQ 7 does not violate 5 U.S.C. § 706(2)(D).

### ii.   The Policy Referenced in FAQ 7 is Arbitrary and Capricious

Under the APA, an agency action, finding, or conclusion can be set aside where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). "The arbitrary and capricious standard is exceedingly deferential." Defs. of Wildlife v. U.S. Dep't of Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) (internal quotations omitted). The Court is "not authorized to substitute [its] own judgment for the agency's as long as [the agency's] conclusions are rational." Miccosukee Tribe of Indians of Fl. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009).

An agency's interpretation of its own regulations "is controlling unless plainly erroneous or inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461 (1997). A court must defer to an agency's interpretation unless the

regulation's plain language compels an alternative reading. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). However, "[a]n agency action is arbitrary and capricious if an agency fails to 'comply with its own regulations.'" Am. Tunaboat Ass'n. v. Ross, 391 F. Supp. 3d 98, 107 (D.D.C. 2019) (quoting Nat'l Envtl. Dev. Ass'n's Clean Air Project v. E.P.A., 752 F.3d 999, 1009 (D.C. Cir. 2014)); see St. Francis Health Care Centre v. Shalala, 205 F.3d 937 (6th Cir. 2000) (reviewing agency guidance to ascertain whether it was an "arbitrary and capricious interpretation" of the statute or prior regulation).

Further, "[t]he possibility of deference can arise only if a regulation is genuinely ambiguous." Kisor v. Wilkie, 139 S.Ct. 2400, 2414 (2019). A finding of genuine ambiguity can only arise after "a court has resorted to all the standard tools of interpretation." Id. And "[a] federal court will temper this measure of deference, however, where the agency's interpretation of its own ambiguous regulation 'conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position, or a post hoc rationalizatio[n] advanced by an agency seeking to defend past agency action against attack." Oceana, Inc. v. Pritzker, 75 F. Supp. 3d 469, 482–83 (D.D.C.

2014) (quoting Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 154 (2012)). Indeed, for a Court to defer to an interpretation, "the agency's reasoning must still be reasonable." Kisor, 139 S.Ct. at 2415 (internal quotations omitted). "In other words, it must come within the zone of ambiguity the court has identified after employing all its interpretative tools." Id. at 2415–16; see San Joaquin Comm. Hosp. v. Thompson, No. CIV F 01-5722 OWW DLB, 2002 WL 34596496, at *13 (E.D. Cal. Aug. 13, 2002) ("A reasonable interpretation is a fortiori not arbitrary or capricious.").

At bottom, "an agency is bound by its own regulations." Panhandle E. Pipe Line Co. v. FERC, 613 F.2d 1120, 1135 (D.C. Cir. 1979). "Thus, an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." Nat'l Env't Dev. Ass'n's Clean Air Project v. E.P.A., 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotations omitted). For example, in National Environmental Development, the D.C. Circuit analyzed interpretive guidance from the E.P.A. in the form of a directive addressed to the Regional Air Directors of each of the ten E.P.A. regions. Id. at 1003. The directive came on the heels of a Sixth Circuit decision reversing the E.P.A.'s application of the one-source rule in an agency action. Id.

at 1002–03. The E.P.A.'s directive clarified that despite the Sixth Circuit's decision, in all other circuits, it "does not intend to change its longstanding practice" in its application of the one-source rule. Id. at 1003.

Plaintiff then brought suit, challenging the directive under 5 U.S.C. § 706(2)(A) because of an E.P.A. regulation requiring consistency between the Regional Offices. Id. at 1008–09. The D.C. Circuit agreed with Plaintiff, finding that the E.P.A.'s regulations precluded the directive by requiring uniformity. Id. at 1011. The Court thus vacated the directive as invalid for conflicting with the E.P.A.'s existing regulations. Id.

Likewise, courts have found agency interpretations applied during adjudication arbitrary and capricious where the agency "appears to have ignored its own regulatory definition" in setting forth its interpretation. Mercy Cath. Med. Ctr. v. Thompson, 380 F.3d 142 (3d Cir. 2004). For example, in Thompson, the Third Circuit evaluated whether the Secretary of Health and Human Services' final decision in an adjudication was arbitrary and capricious. Id. at 151. There, the court assessed a hospital's reimbursement from Medicare for graduate medical training, specifically focusing on the Provider Reimbursement Review Board's decision denying

reclassification of certain graduate medical education costs. Id. at 150–51. The Board found the hospital's documentation was insufficient to justify a reclassification and recission of costs, based in part on the Secretary's interpretive rule limiting corrections upon reaudit to misclassified operating costs. Id. at 150.

The court disagreed with the Board, finding that the Secretary's interpretation was arbitrary and capricious because it "contradict[ed] the plain language of [an existing regulation], ha[d] not been applied consistently, and [was] unreasonable." Id. at 158. Specifically, the court found that the Secretary's interpretive rule "directly contradict[ed] the plain language of the . . . regulation and cannot be upheld." Id. at 153. In doing so, the court noted that the Secretary's inconsistent application of the interpretive rule and its substantive unreasonableness precluded the court from affording deference to its interpretation. Id.; see also Comite' De Apoyo A Los Trabajadores Agricoles v. Perez, 774 F.3d 173, 190 (3d Cir. 2014) (finding Department of Labor wage guidance invalid under 5 U.S.C. § 706(2)(A) where it "directly contradict[ed] the current wage definition" set forth in the agency's regulations).

Here, to determine whether to afford the Department's interpretation deference, the Court must first assess whether the phrase "regular basis" is "genuinely ambiguous." See Kisor, 139 S.Ct. at 2414 (requiring "genuine ambigu[ity]" for deference). While the Secretary does not make an affirmative argument for why the phrase "regular basis" is ambiguous, it notes that such a finding would require the Court to show deference to its interpretation. (Doc. # 49 at 45-46). ASA contends that the phrase is not ambiguous. (Doc. # 50 at 3).

While the standard for a finding of ambiguity is exacting, the Court need not undertake that inquiry because the policy referenced in FAQ 7 is not a reasonable interpretation of either the text of ERISA or the 1975 Regulation, regardless of the precise contours of the phrase "regular basis." See Kisor, 139 S.Ct. at 2415 (explaining the exhaustive inquiry courts undergo to determine ambiguity). As the Court will detail below, the policy referenced in FAQ 7 impermissibly unmoors the focus of the inquiry into whether an individual is a fiduciary away from a specific ERISA plan, rendering it inconsistent with the statute and previous guidance. Therefore, because the Department's interpretation of the 1975 Regulation is unreasonable, it is not entitled to

deference. See Kisor, 139 S.Ct. at 2415 (finding an agency's interpretation must be reasonable to get deference).

As an initial matter, the Court takes this opportunity to delineate precisely what the policy referenced in FAQ 7 entails. To do so, the Court finds it helpful to spell out the definition of fiduciary with and without the added gloss of the 2020 Exemption. Under ERISA, "a person is a fiduciary with respect to a plan to the extent . . . he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property *of such plan*, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A) (emphasis added). The 1975 Regulation provides a five-step test for determining when a person "renders investment advice" within the meaning of 29 U.S.C. § 1002(21)(A). As relevant here, one prong of the test requires that such advice be given "on a regular basis to the plan." 29 C.F.R. § 2510.3-21(c)(1).

Because of the requirement that investment advice to a plan be given on a regular basis to trigger fiduciary duties, "the definition exclude[s] one-time transactions like IRA rollovers." Chamber of Commerce, 885 F.3d at 365; see Fiduciary Rule, 80 Fed. Reg. 21928-01, 21951 ("These

47

rollovers [] will be one-time and not 'on a regular basis' and thus not covered by the 1975 standard[.]").

Indeed, FAQ 7 clarifies that "[a] single, discrete instance of advice to roll over assets from an employee benefit plan to an IRA would not meet the regular basis prong of the 1975 test." (JA Doc. #54-1 at 191). However, the provision of advice to roll over assets could constitute the rendering of investment advice if that advisor "expects to regularly make investment recommendations regarding the IRA as part of an ongoing relationship[.]" (Id.). An example of a situation where the first-time provision of advice concerning a rollover would trigger fiduciary duties is where the discussions about a rollover include "the parties agreeing to check-in periodically on the performance of the customer's post-rollover financial products" — that is, advise on the performance of non-ERISA assets. (Id. at 10).

Thus, to ascertain whether the policy referenced in FAQ 7 is a reasonable interpretation of ERISA and the 1975 Regulation, the question for the Court is whether, under the text of ERISA and the 1975 Regulation, the future provision of advice pertaining to an IRA would fall within the definition of "render[ing] investment advice" to an employee benefit plan. See Kisor, 139 S.Ct. at 2417 ("Finally, an

48

agency's reading of a rule must reflect "fair and considered judgment" to receive <u>Auer</u> deference.").

The Court finds that it does not. The Court's analysis is guided by that in <u>Carfora v. Teachers Insurance Annuity Association of America</u>, --- F. Supp. 3d ---, 2022 WL 4538213 (S.D.N.Y. Sept. 27, 2022). There, Plaintiffs brought suit against TIAA, which provided Plaintiff's employer-sponsored plans with various administrative and investment-related services, based on alleged breaches of fiduciary duties regarding advice to roll over assets into a managed account service. <u>Id.</u> at *1. Declining to retroactively apply the 2020 Exemption and associated guidance, the court was thus faced with the question of whether, under the statutory and regulatory framework, TIAA provided "investment advice" on a "regular basis." <u>Id.</u> at *12–13.

The <u>Carfora</u> court first noted that the phrase "'regular basis' is meant to be understood in the context of the *plan's* investment decisions." <u>Id.</u> at *13 (emphasis in original). The statutory text provides that "a person is a fiduciary with respect *to a plan* to the extent . . . he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property *of such plan*, or has any authority or responsibility to do so[.]" 29 U.S.C. §

1002(21)(A)(ii) (emphasis added). Thus, the scope of the regular basis inquiry is limited to the provision of advice pertaining to a particular plan. See Adv. Salon Visions Inc. v. Lincoln Benefit Life Co., No. 08 Civ. 2346 (LAB) (WMC), 2010 WL 3341803 (S.D. Cal. Aug. 25, 2010) ("[I]t doesn't make a meaningful difference that Plaintiffs adopted multiple plans on the advice of the Defendants, and over the course of several years. This is because an ERISA fiduciary is a fiduciary of a *plan*." (emphasis in original)).

Second, the Carfora court found that the "promise of future investment advice, . . . is not, itself, an additional instance of advice-giving relevant to the regular basis inquiry." Carfora, 2022 WL 4538213, at *16. The court reasoned that to determine whether TIAA rendered advice on a regular basis, it need only take into account "advice given while the assets are, in fact, plan assets[.]" Id. "Focusing the analysis on only the timeframe when the assets in question were plan assets," the court found that the actions taken following the rollover "are outside the scope of the analysis[.]" Id.

The Carfora court's analysis has application to this Court's present task. As the court in Carfora makes clear, whether an individual is a "fiduciary" is determined with

respect to a particular ERISA plan. See Id. (conducting the "regular basis" inquiry with respect to a particular plan); 29 C.F.R. § 2510.3-21(c)(1) ("A person shall be deemed to be rendering 'investment advice' *to an employee benefit plan*, within the meaning of [ERISA] section 3(21)(A)(ii) . . . only if . . . [s]uch person . . . [r]enders any advice . . . on a regular basis *to the plan*[.]") (emphasis added). Before a rollover occurs, a professional who gives rollover advice does so with respect to an ERISA-governed plan. However, after the rollover, any future advice will be with respect to a new non-ERISA plan, such as an IRA that contains new assets from the rollover. The professional's one-time rollover advice is thus the last advice that he or she makes to the specific plan. So, while an offer to provide future advice may, as the Department suggests, be the beginning of a relationship, that relationship is inherently divorced from the ERISA-governed plan. Because any provision of future advice occurs at a time when the assets are no longer plan assets, it is not captured by the "regular basis" analysis.

Because the policy referenced in FAQ 7 abandons this plan-specific focus in the context of rollovers, it sweeps conduct into its purview that would not otherwise trigger fiduciary obligations. Indeed, like in National Environmental

Development, the Department has promulgated interpretive guidance that is directly at odds with its own regulations. See Nat'l Env't Dev., 752 F.3d at 1003 (finding agency guidance invalid when in conflict with existing regulations). While the Court recognizes that here, unlike in National Environment Development, the challenged guidance purports to interpret the prior regulation, that distinction is of no moment. The 1975 Regulation makes clear that to subject an advisor to fiduciary duties, he or she must make advice to a plan on a regular basis. 29 C.F.R. § 2510.3-21(c)(1)(ii)(B). The policy referenced in FAQ 7 departs from this standard by sweeping advice that is not made to an ERISA plan into its ambit. Because the policy referenced in FAQ 7 allows fiduciary obligations to be premised on conduct that does not fall within the "regular basis to a plan" analysis, the Department has "fail[ed] to comply with its own regulations." Nat'l Env't Dev., 752 F.3d at 1009.

Similarly, like in Thompson, the policy referenced in FAQ 7 contradicts the plain language of the rule it purports to interpret. See Thompson, 380 F.3d at 153 (finding agency action arbitrary and capricious when it conflicts with the agency's regulations). Under the 1975 Regulation, for an advisor to "render[] investment advice," he or she must do so

"on a regular basis to the plan." 29 C.F.R. § 2510.3-21(c)(1). Because assets cease to be assets of an ERISA plan after the rollover is complete, any future provision of advice is, by nature, no longer to that ERISA plan. Thus, because the 1975 Regulation focuses the regular basis inquiry on a particular plan, the policy referenced in FAQ 7 contradicts that regulation to the extent it disposes of the requirement that advice be made to a particular plan.

The Department makes several arguments in support of the policy referenced in FAQ 7, which the Court will address in turn. First, the Department attempts to clarify that the policy referenced in FAQ 7 would not sweep *all* one-time IRA rollover or annuity transcripts into the ambit of the 1975 Regulation. (Doc. # 40-41). Neither the Court nor, apparently, ASA, disagree with that proposition. See (Doc. # 50 at 1 n.4) ("ASA has never made the 'strawman assertion' that 'all one-time rollovers are covered' under the pronouncements in FAQ 7."). The Court recognizes that FAQ 7 makes clear that "[a] single, discrete instance of advice to roll over assets from an employee benefit plan to an IRA would not meet the regular basis prong of the 1975 text." (JA Doc. # 54-1 at 191). However, in the absence of the policy referenced in FAQ 7, this advice would never satisfy the

regular basis inquiry. Permitting these transactions to satisfy the "regular basis" prong, even if infrequently, is incompatible with the 1975 Regulation. Thus, even though the policy referenced in FAQ 7 does not make *all* one-time IRA rollover or annuity transactions subject to fiduciary duties, even the Department's narrower interpretation conflicts with its prior regulations.

Second, the Department contends that "such a myopic focus on *plans* to the exclusion of the money or property that make up a particular ERISA plan" is improper. (Doc. # 49 at 42) (emphasis in original). But the Department's reliance on LaRue v. DeWolff, Boberg, & Assoc., Inc., 552 U.S. 248 (2008), is misplaced. There, the Supreme Court addressed the narrow question of whether Section 502(a)(2) provides a remedy for an individual who brings suit for a breach of fiduciary duty, or whether the remedy was limited to plans. Id. at 256. The Court found that although Section 502(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." Id. Nothing in that decision suggests the word "plan" in ERISA really means "the investor's assets," regardless of the plan. Indeed, the use of the phrase "plan

assets" in LaRue is meant to convey the idea that fiduciary misconduct does not need to "threaten the solvency of the entire plan" to harm an individual investor – hence, an economic injury to "plan assets" is actionable even if the injury is not to the "entire plan." Id. at 255–56. At no point does the Court in LaRue discuss assets that have been removed from a plan, or indicate that an advisor owes duties to an individual, rather than the plan. In short, LaRue never shifts the object of an advisor's fiduciary duties away from an ERISA plan. Thus, LaRue does not persuade the Court to read the text of ERISA or the 1975 Regulation differently.

The Department next contends that ASA's position would "lead to absurd outcomes." (Doc. # 49 at 43). This is because, according to the Department, the five-part test for fiduciaries applies to both Title I and the Internal Revenue Code, and "[i]t would make no sense to treat someone who would satisfy the fiduciary definition with respect to the Title II plan following the rollover as exempt from fiduciary status with respect to the original rollover recommendation." (Id.). Accordingly, ASA's position would mean "arbitrarily dividing an ongoing relationship[.]"

The Court does not find this persuasive. As an initial matter, ASA's – and the Court's – reading of the 1975

55

Regulation is exactly that advanced by the Department for almost forty years. See Fiduciary Rule, 81 Fed. Reg. at 20955 ("One example of the five-part test's shortcomings is the requirement that advice be furnished on a 'regular basis' . . . . The 'regular basis' requirement . . . deprives individual participants and IRA owners of statutory protection when they seek specialized advice on a onetime basis . . . (e.g., as in the case of . . . a rollover from a plan to an IRA)."); see also Id. at 20949 ("Because advice on rollovers is usually one-time and not 'on a regular basis,' it is often not covered by the 1975 standard[.]"). Because ASA's reading of the 1975 Guidance is that which the Department adhered to for several decades, the Court is reluctant to find it "absurd."

Further, "an absurdity is not a mere oddity. The absurdity bar is high, as it should be." Tex. Brine Co., L.L.C. v. Am. Arb. Ass'n, Inc., 955 F.3d 482, 486 (5th Cir. 2020). For a Court to find a statute's plain meaning absurd, "[t]he result must be preposterous, one that no reasonable person could intend." Id. (internal quotations omitted). Here, the Department contends it is absurd that conduct that would subject an investor to fiduciary obligations under the Code would not trigger fiduciary obligations under Title I.

The Court does not find this outcome "preposterous." To determine whether an individual is a fiduciary under ERISA, "a court must ask whether a person is a fiduciary with respect to the *particular activity at issue*." Cotton v. Mass. Mut. Life Ins. Co., 402 F.3d 1267, 1277 (11th Cir. 2005) (emphasis added) (internal quotations omitted); see also Perez v. Geopharma, Inc., No. 8:14-cv-66-VMC-TGW, 2014 WL 3721369, at *3 (M.D. Fla. July 25, 2014) (evaluating whether an individual was a fiduciary with respect to the "particular activity" of remittance of employee premium contributions). In other words, the "divi[sion] of an ongoing relationship" is not arbitrary, as the Department suggests, but rather a natural consequence of Congress' "functional approach to defining an ERISA fiduciary." Cotton, 402 F.3d at 1279. While the Department may disagree with segmenting the fiduciary inquiry based on which plan advice was made to as a matter of policy, the fact that conduct might trigger fiduciary duties under the Code but not Title is not, by itself, absurd.

Because the policy referenced in FAQ 7 conflicts with the Department's existing regulations, it is an arbitrary and capricious interpretation of the 1975 Regulation. The Court thus grants summary judgment to ASA on Count II.

2. **FAQ 15**

   i. **The Policy Referenced in FAQ 15 is a Procedurally Proper Interpretive Rule**

ASA contends that the policy referenced in FAQ 15 is a legislative rule because it "imposes numerous documentation and investigation requirements that are contained nowhere in the Exemption." (Doc. # 39 at 14). The Department's position is that the text of the FAQs make clear that the agency was merely interpreting an existing regulation and giving guidance to market participants. (Doc. # 49 at 31).

Again, while not dispositive, the Court begins with the agency's own characterization of its guidance. See Iowa League of Cities, 711 F.3d at 872 (describing an agency's characterization of its rule as legislative or interpretive is relevant). Here, as with FAQ 7, the Department has characterized the policies referenced in the FAQs as interpretative. As discussed, to introduce the FAQs, the Department notes, "[t]he following FAQs *provide guidance* on PTE 2020-02 and information on the Department's next steps in its regulation of investment advice." (JA Doc. # 54-1 at 187) (emphasis added). And the Department emphasizes in its response to ASA's motion that, in the FAQs, "the agency was interpreting an existing regulation." (Doc. # 49 at 31).

While the agency's characterization is not dispositive, the Court is persuaded that the policy referenced in FAQ 15 is interpretive, rather than legislative. The 2020 Exemption imposes documentation requirements on parties wishing to take advantage of the Exemption. Specifically, financial institutions must "document[] the specific reasons that any recommendation to roll over assets . . . is in the Best Interest of the Retirement Investor." (JA Doc. # 54-1 at 67). The pronouncements in FAQ 15 clarify what these documentation requirements entail, setting out the factors that financial institutions and investment professionals should "consider and document." (Id. at 195). The guidance then sets out a non-exhaustive list of factors to consider, including:

> the alternatives to a rollover, including leaving the money in the investor's employer's plan, if permitted; the fees and expenses associated with both the plan and the IRA; whether the employer pays for some or all of the plan's administrative expenses; and the different levels of services and investments available under the plan and the IRA.

(Id.). The FAQ goes on to note that "investment professionals and financial institutions should make diligent and prudent efforts to obtain information about the existing employee benefit plan and the participant's interests in it," noting

that such information should generally be "readily available." (Id.).

The policy referenced in FAQ 15 is thus a procedurally proper interpretive rule. The policy merely defines the documentation requirements set out in the 2020 Exemption. See Nat'l Mining Ass'n, 758 F.3d at 251–52 (noting that a legislative rule "purports to impose legally binding obligations or prohibitions on regulated parties," while an interpretative rule "merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties"). Indeed, the source of the new obligation on the parties – that they must provide documentation – comes from the 2020 Exemption itself. See Nat. Res. Def. Council v. Wheeler, 955 F.3d 68, 83 (D.C. Cir. 2020) (noting that an interpretive rule "derive[s] a proposition from an existing document," such as a statute, regulation, or judicial decision, "whose meaning compels or logically justifies the proposition"). The policy referenced in FAQ 15 does not impose any new duties on the regulated parties; rather, it defines the focus of the existing obligation. See Mendoza, 754 F.3d at 1023 (finding guidance to be legislative where there was no existing statute or regulation that created the

60

substantive standards the guidance purported to interpret); Am. Min. Congress, 995 F.2d at 1110 ("But the legislative or interpretive status of the agency rules turns not in some general sense on the narrowness or breadth of the statutory (or regulatory) term in question, but on the prior existence or non-existence of legal duties and rights."). Thus, the policy referenced in FAQ 15 is an interpretive, not legislative, rule.

Because the policy referenced in FAQ 15 is an interpretive rule, notice and comment was not required. 5 U.S.C. § 553(b)(3)(A). Accordingly, the policy referenced in FAQ 15 does not violate 5 U.S.C. § 706(2)(D).

### ii.  **The Policy Referenced in FAQ 15 is not Arbitrary and Capricious**

ASA next contends that the policy referenced in FAQ 15 is arbitrary and capricious. Again, an agency action, finding, or conclusion can be set aside where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" but the standard is "exceedingly deferential." 5 U.S.C. § 706(2)(A); Defs. of Wildlife, 733 F.3d at 1115.

ASA argues that the policy referenced in FAQ 15 is arbitrary and capricious because it is "unreasonable and

inconsistent with a plain reading of the Exemption." (Doc. # 39 at 26). According to ASA, because the specific documentation requirements laid out in FAQ 15 impose specific obligations under the guide of interpretation, they exceed the scope of the 2020 Exemption. (Id. at 26–27).

The first question for the Court is whether the phrase "documents the specific reasons that any recommendation to roll over assets . . . is in the Best Interest of the Retirement Advisor" is ambiguous. See Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d 380, 399 (5th Cir. 2014) ("[A]n agency is not entitled to deference when it offers up an interpretation of the Regulation that we have already said to be unambiguously foreclosed by the regulatory text."). The Court finds it is not. Notably, the Department does not offer any argument for why the phrase is ambiguous; rather, it appears to leave the task to the Court. See (Doc. # 49 at 48) (noting deference would apply "assuming the Exemption's guidance . . . is ambiguous"). The Court nevertheless takes this opportunity to assess whether the phrase is "genuinely ambiguous." See Kisor, 139 S.Ct. at 2415 (noting genuine ambiguity is required for judicial deference).

Cambridge Dictionary defines "document" as "to record the details of an event, a process, etc." Document, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/document (last accessed February 7, 2023). The term "documents" in the 2020 Exemption thus requires the covered parties to make a record. The object of the word "documents" is "the specific reasons;" thus, the specific reasons are what is to be documented. "Specific" is defined as "specifying or specified; precise, definite, explicit." Specific, Webster's New World College Dictionary (4th ed), https://www.yourdictionary.com/specific (last accessed February 7, 2023). This means that the reasons for the rollover recommendation must be set forth with a degree of granularity. And Section V(b) of the 2020 Exemption defines "Best Interest of the Retirement Advisor." (JA Doc. # 54-at at 25). The policy referenced in FAQ 15 unambiguously obligates investment advisors to make an explicit record of the factors that lead them to determine a rollover is in the Best Interest of the Retirement Advisor.

Because the Court has concluded that the policy referenced in FAQ 15 should be construed according to its plain meaning, the Department's interpretation of the guidance does not warrant Auer deference. However, the Court

finds that the policy is not at odds with the text of the 2020 Exemption. As discussed, the 2020 Exemption requires an investment advisor, when making a recommendation to roll over assets, to make a record of the reasons he or she found the recommendation to be in the best interest of the investor. (Id. at 67). Nothing in FAQ 15 contradicts this requirement. While the FAQ offers specifics on the factors that ought to be considered and documented, none of these specifics are outside of the scope of the 2020 Exemption or impose new requirements. Indeed, as the Department notes, "the required documentation comprises the very type of information that a reasonable investment advisor would expect to receive in deciding whether a rollover was in his best interest." (Doc. # 49 at 48). Specifically, information such as alternatives to a rollover, the fees and expenses associated with the plan and the IRA, the degree that an investor's employer will pay for the plan's administrative expenses, and the services and investments available under the plan and the IRA is within the bounds of that which one acting as "a prudent person . . . familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" (JA Doc. # 54-1 at 25). In short, the type of documentation that FAQ 15 requires is precisely of the nature that a prudent

investment advisor would undertake. Accordingly, it neither contradicts the 2020 Exemption nor goes beyond it. The Court finds that the policy referenced in FAQ 15 is not arbitrary and capricious.

###    C.    <u>The Department of Labor's Motion for Summary Judgment</u>

The Department seeks summary judgment on all counts. (Doc. # 49 at 28, 36). Because the Court has already determined that summary judgment in favor of ASA is appropriate on Count II, the Court denies the Department's motion to that extent. However, for the reasons discussed above, the Court finds that neither FAQ 7 nor FAQ 15 are legislative rules. Thus, summary judgment in favor of the Department is appropriate on Counts I and III. Likewise, as discussed, the policy referenced in FAQ 15 is not arbitrary and capricious. Summary judgment in favor of the Department is thus appropriate on Count IV.

###    D.    <u>The Policy Referenced in FAQ 7 is Vacated for Violating the APA</u>

ASA seeks a declaratory judgment that the Department's pronouncements are unlawful, for the Court to enjoin the Department from enforcing the pronouncements anywhere in the Department's jurisdiction, and for the Court to vacate and set aside the pronouncements. (Doc. # 39 at 29).

The APA requires that courts "hold unlawful and set aside agency action" that violates the APA or exceeds the agency's authority. 5 U.S.C. § 706. Courts interpret this provision as authorizing vacatur. Indeed, "vacatur . . . is the ordinary APA remedy." Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1290 (11th Cir. 2015) (quotation omitted); see Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (describing vacatur as "the normal remedy" for an APA violation); Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005) ("[U]nsupported agency action normally warrants vacatur[.]").

"In deciding whether an agency's action should be remanded without vacatur, a court must balance the equities." Black Warrior Riverkeeper, 781 F.3d at 1290. To do so, courts consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150 (D.C. Cir. 1993).

Here, the "seriousness of the order's deficiencies" counsel in favor of vacatur. Id. The Court found that the premise of the policy referenced in FAQ 7 inherently conflicts

with the "regular basis" prong of the 1975 Regulation. The Department cannot meaningfully correct these deficiencies on remand without changing the entire character of the policy. See Am. Hosp. Ass'n v. Becerra, No. 18-2084 (RC), 2022 WL 4534617, at *2 (D.D.C. Sept. 28, 2022) (finding a deficiency serious where "no amount of reasoning on remand will allow the Secretary to re-implement the [policy] in the same manner").

Further, the Court cannot identify disruptive consequences of an interim change such that the policy referenced in FAQ 7 necessitates a winddown period. See Am. Great Lakes Ports Ass'n v. Schultz, 962 F.3d 510, 519 (D.C. Cir. 2020) ("[A] quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome."). The Department cites to no "settled transactions" that vacatur would disrupt. See Id. (noting remand without vacatur appropriate where vacatur would disrupt settled transactions).

The Court thus finds that vacatur is the appropriate remedy with respect to the policy referenced in FAQ 7. See Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165 –66 (2010) ("If a less drastic remedy (such as partial or complete vacatur of APHIS's deregulation decision) was sufficient to

67

redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted."); <u>O.A. v. Trump</u>, 404 F. Supp. 3d 109, 118 (D.D.C. 2019) ("As a result, vacatur — i.e., nullification — of the Interim Final Rule obviates any need for the issuance of an injunction.").

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   The Department of Labor and Marty Walsh's Motion to Dismiss (Doc. # 49) is **DENIED.**

(2)   The American Securities Association's Motion for Summary Judgment (Doc. # 39) is **GRANTED** in part and **DENIED** in part.

(3)   Summary judgment is granted in favor of the American Securities Association on Count II.

(4)   The Department of Labor and Marty Walsh's Motion for Summary Judgment (Doc. # 49) is **GRANTED** in part and **DENIED** in part.

(5)   Summary judgment is granted in favor of the Department of Labor and Marty Walsh on Counts I, III, and IV.

(6)   The Court **DECLARES UNLAWFUL** and **VACATES** the policy referenced in FAQ 7, remanding it to the Department of Labor for further proceedings consistent with this Order.

(7)   The   Clerk   shall   enter   judgment   accordingly   and,
thereafter, **CLOSE** this case.

**DONE and ORDERED** in Chambers in Tampa, Florida, this
<u>13th</u> day of February, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE